THOMAS HUNT *v.* JOHN PRIOR ET AL.
(15210)

Peters, C. J., and Callahan, Berdon, Norcott and Palmer, Js.

422

Argued October 25, 1995—decision released March 26, 1996

*Joseph C. Morelli*, for the appellant (plaintiff).

*James G. Green, Jr.*, with whom, on the brief, was *Richard F. Wareing*, for the appellees (defendants).

PALMER, J. The sole issue presented by this appeal is whether the trial court properly granted the motion of the defendants, the board of police commissioners for the borough of Naugatuck (board) and the individual members of the board,[1] to set aside a jury verdict in favor of the plaintiff, Thomas Hunt, a member of the Naugatuck police department (department). The plaintiff brought this action seeking damages for his allegedly wrongful suspension by the board. Following a six week trial, the jury found for the plaintiff on all counts and awarded him $550,000. Upon the motion of the defendants, the trial court set aside the jury verdict and rendered judgment for the defendants. The plaintiff

---

[1] The individual defendants are John Prior, Rocco DeCarlo, Robert Sharon, Edward Mason, Maruta Jancis and Terry Buckmiller.

appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The plaintiff was hired as a police officer by the borough of Naugatuck (borough) in 1965. After several promotions within the department, the plaintiff, on March 5, 1985, was appointed an administrative captain. Shortly thereafter, however, on July 1, 1985, the plaintiff took an extended medical leave of absence from the department due to a claimed stress disorder and did not return to work until March 17, 1987.[2]

Subsequent to the plaintiff's promotion to administrative captain and while he was on leave from the department, the board initiated an investigation into allegations that the plaintiff had violated certain departmental rules and regulations.[3] In November, 1986, Kevin McSherry, the attorney retained by the borough to conduct the investigation, presented the board with a list of allegations against the plaintiff.[4] The board, however, took no formal action on the allegations at that time.

[2] The borough initially challenged the plaintiff's entitlement to a paid leave of absence. The plaintiff was ultimately awarded full pay and benefits, however, for the entire period of time that he was on medical leave from the department.

[3] By special act of the legislature, the board has the responsibility to "administer, maintain and control" the borough's police department. 26 Spec. Acts 934, No. 321, § 3 (1953).

[4] McSherry alleged, inter alia, that the plaintiff had: (1) failed to register certain police vehicles with the state department of motor vehicles; (2) been absent from the department without proper authorization from August 23, 1985, to October 4, 1986; (3) filed an accident report on an official department form while under suspension; and (4) failed to report to a physician, as required by the rules and regulations of the Naugatuck police department, after having been absent from work due to illness for more than seven days.

Shortly before the plaintiff's return to active duty on March 17, 1987,[5] McSherry presented the board with a second set of allegations against the plaintiff, and on March 18, 1987, the board met to determine what action, if any, to take with respect to those allegations. At that meeting, which was attended by the plaintiff and his attorney, the board voted to file formal charges against the plaintiff.[6] The board also voted to suspend the plain-

[5] In February, 1987, the board had voted to allow the plaintiff to return to work upon receipt of appropriate medical authorization from the plaintiff's physician. Although the plaintiff thereafter provided the board with such authorization, the board's chairman nevertheless refused to permit the plaintiff to return to active duty, apparently due to allegations that the plaintiff had violated certain rules and regulations of the department. Upon learning that he would not be allowed to return to active service, the plaintiff filed a mandamus action against the board seeking his immediate reinstatement. Shortly after his filing of the mandamus action, however, the plaintiff, on March 17, 1987, was allowed to resume his duties as administrative captain.

[6] The board presented the plaintiff with the following list of charges on March 18, 1987:

"CHARGES

"1. Captain Hunt assisted in forcing an officer to write a statement against other officers by threats/unfounded accusations.

"2. Captain Hunt has and continues to make threats that affect other officers' safety.

"3. Officer/Officers under Captain Hunt's supervision failed to be present on duty hours.

"4. Police cars were not properly maintained by Officer/Officers directly under Captain Hunt's supervision.

"5. Police car maintenance records were not maintained and documentation of maintenance schedules [was] not done by Captain Hunt.

"6. Captain Hunt had a Police Department mechanic perform work on his personal vehicle while said Officer was on duty.

"7. Captain Hunt failed to register two (2) police vehicles and placed recovered license plates on said vehicles.

"8. Captain Hunt permitted [an] officer on the shift he was in charge of to take a Borough of Naugatuck police vehicle to that officer's private home and keep it in the officer's garage, while said officer remained at home during the officer's working hours.

"9. $8,000.00 of auto parts were unaccounted for by Captain Hunt and vehicles of the Police Department were poorly maintained.

"10. The Commission shall also review issues relating to Captain Hunt's absence as it relates to the Union Contract; specifically his failure to return to work within time periods prescribed in said Union Contract."

tiff, with pay, pending a resolution of the charges.[7]

On May 31, 1988, the board presented the plaintiff with a revised list of charges.[8] Prior to the commencement of a formal hearing on those charges, however, the board informed the plaintiff that it would proceed on only four of the allegations.[9] Finally, on March 7, 1989,[10] hearings on the remaining charges were commenced.[11] At the conclusion of the hearings, in August, 1989, the board dismissed all four charges and reinstated the plaintiff to active duty as administrative captain.

[7] Rule 17, § 1, of the rules and regulations of the police department of the borough of Naugatuck provides that a police officer may be removed or suspended for the following reasons: (1) "Neglect of duty"; (2) "Neglect or disobedience of orders"; (3) "Acts of insubordination or disrespect toward [a] superior officer"; (4) "Violation of department rules and regulations"; (5) "Violation of Federal or State laws or Borough ordinances"; (6) "Acts of tyranny or oppression"; (7) "Immoral conduct"; (8) "Intoxication"; (9) "Absence without leave"; (10) "Conduct unbecoming a member of the Police Force"; and (11) "Conduct injurious to the public peace and welfare."

[8] This revised list, which did not contain the charges enumerated in the first, eighth and ninth paragraphs of the first set of charges filed against the plaintiff on March 18, 1987; see footnote 6; included two new allegations of misconduct, namely, that the plaintiff had signed the name of Anthony Scatena to two contracts for the sale and purchase of real estate without first obtaining Scatena's authorization to do so.

[9] The board advised the plaintiff that it would proceed on only the charges that he had failed: (1) to maintain police vehicles in accordance with departmental rules and regulations; (2) to retain documentation concerning repairs and maintenance performed on police vehicles; (3) to register two police vehicles with the state department of motor vehicles; and (4) to ensure that the proper license plates were affixed to certain police vehicles, all in violation of rule 17, § 1 (1), (2), (10) and/or (11) of the rules and regulations of the police department of the borough of Naugatuck. See footnotes 6 and 7.

[10] The lengthy delay from the filing of the charges until the commencement of the hearings was due in part to difficulties encountered by the board in obtaining certain transcripts of a state grand jury investigation into allegations of corruption in the borough, and because the board was conducting hearings on alleged wrongdoing by the chief of police, Dennis Clisham. See generally *Clisham* v. *Board of Police Commissioners*, 223 Conn. 354, 613 A.2d 254 (1992).

[11] Pursuant to a stipulated agreement between the parties, the defendants Buckmiller and DeCarlo did not participate in the adjudication of the charges against the plaintiff.

Prior to the commencement of the hearings, the plaintiff, on June 16, 1988, initiated this action, claiming that the filing of the charges and his suspension by the board were the result of a politically motivated vendetta against him by the borough's mayor, Terry Buckmiller, who was also a member of the board.[12] In the first count of his complaint, the plaintiff alleged that he had been suspended without just cause in violation of the collective bargaining agreement between the borough and the plaintiff's union, the International Brotherhood of Police Officers, Local 385.[13] In the second count of the complaint, he alleged that the board had committed a "wilful, wanton, capricious and illegal" breach of the collective bargaining agreement[14] by entertaining charges against him that were predicated upon an unsworn citizen's complaint[15] contrary to article XXII, § 22.05, of the agreement.[16] In the remaining three

[12] The plaintiff claimed that Buckmiller wished to have him removed as administrative captain in order to eliminate him as a candidate for higher office, thereby ensuring the continued advancement of William Long, a police captain and alleged ally of Buckmiller. Long, in fact, was eventually appointed the borough's police chief.

[13] Article XIX, § 19.02, of the collective bargaining agreement between the borough and the plaintiff's union provides in relevant part that "[n]o permanent employee shall be removed, dismissed, discharged, suspended, fined, reduced in rank or disciplined in any other manner except for just cause." It is not disputed that the plaintiff was, at all times relevant to this action, a "permanent employee" as defined under the collective bargaining agreement.

[14] The plaintiff characterizes this count of his complaint as a "tortious breach of contract" claim.

[15] The plaintiff alleged that the complaint underlying the charges concerning Anthony Scatena; see footnote 8; was not in writing and signed by Scatena.

[16] At the time the charges were presented to the plaintiff, article XXII, § 22.05, of the collective bargaining agreement provided in relevant part: "Any charge or complaint by a member of the public against any police officer may be made, but neither the Chief nor the Board of Police Commissioners shall recognize the charge or complaint as valid unless it is in writing and signed by the complainant under oath."

counts,[17] all brought under 42 U.S.C. § 1983,[18] the plaintiff alleged that the board had: (1) suspended him without just cause in violation of his right to procedural due process under the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution; (2) violated his right to substantive due process under the federal and state constitutions by proceeding against him in a "wilful, arbitrary and capricious" manner; and (3) improperly singled him out for administrative action in violation of his right to the equal protection of the law as guaranteed by the fourteenth amendment to the federal constitution and article first, § 20, of the state constitution.[19] The plaintiff sought permanent reinstatement to active duty as administrative captain, compensatory and punitive damages, attorney's fees and costs.

The jury found in favor of the plaintiff on all counts, awarding him compensatory and punitive damages in the amount of $430,000 against the board, $90,000 against Buckmiller, and $6000 each against Prior, DeCarlo, Sharon, Mason and Jancis. At the conclusion of the trial, however, the trial court granted the defendants' motion to set aside the verdict with respect to each count. As to the plaintiff's two common law claims, the trial court concluded that it lacked subject matter

---

[17] The original complaint contained six counts, one of which was withdrawn by the plaintiff after trial.

[18] Title 42 of the United States Code, § 1983, provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[19] The plaintiff does not claim that he is entitled to any greater protection under the state constitutional provisions invoked in his complaint than he is entitled to under the analogous provisions of the federal constitution. For the purposes of this appeal, therefore, we treat the analogous state and federal constitutional provisions as embodying the same level of protection.

jurisdiction over those counts because the plaintiff had failed to exhaust his administrative remedies under the collective bargaining agreement. The trial court also set aside the verdict with respect to the plaintiff's three claims under 42 U.S.C. § 1983, concluding that, as to his due process claims, the plaintiff had failed to establish that the defendants' actions had deprived him of a constitutionally protected property or liberty interest and, as to his equal protection claim, the plaintiff had not proved that the board had treated him differently from others similarly situated.[20]

On appeal, the plaintiff contends that the trial court improperly granted the defendants' motion to set aside the verdict with respect to each of the five counts. Because we agree with the trial court that the plaintiff is not entitled to relief on any of his claims as a matter of law, we affirm the judgment of the trial court.

I

The plaintiff maintains that the trial court improperly set aside the verdict with respect to the breach of contract and tortious breach of contract counts of his complaint.[21] Specifically, he argues that the trial court

---

[20] The trial court also concluded that the doctrine of absolute immunity shielded the defendants from liability on all three of the plaintiff's claims under 42 U.S.C. § 1983. We need not reach this issue in light of our determination that the trial court properly concluded that the plaintiff had otherwise failed to establish a constitutional violation.

[21] The standard for reviewing a trial court's ruling on a motion to set aside the verdict is well established. "The trial court has the inherent power to set aside a jury verdict which, in the court's opinion, is either against the law or the evidence. . . . The decision to set aside a verdict involves the exercise of a broad discretion in the trial court which, in the absence of a clear abuse, will not be disturbed and, in reviewing the exercise of that discretion, every reasonable presumption should be indulged in favor of its correctness. . . ." (Internal quotation marks omitted.) *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, 216 Conn. 200, 206, 579 A.2d 69 (1990). Litigants, however, have a constitutional right to have the jury and not the court decide issues of fact as to which reasonable people may reach different conclusions. *Berry* v. *Loiseau*, 223 Conn. 786, 807, 614 A.2d 414 (1992);

improperly concluded that it lacked subject matter jurisdiction over those claims because he had failed to exhaust the administrative remedies available to him under the collective bargaining agreement.[22] In support of this argument, the plaintiff asserts that he should be excused for failing to exhaust his administrative remedies both because it would have been futile for him to do so and because those remedies were inadequate in light of the relief he sought. We agree with the trial court that the plaintiff's failure to exhaust his administrative remedies deprived the court of jurisdiction over his common law claims.[23]

---

*Mather* v. *Griffin Hospital*, 207 Conn. 125, 138, 540 A.2d 666 (1988). "Thus, the role of the trial court on a motion to set aside the jury's verdict is not to sit as [an added] juror, but, rather, to decide whether, viewing the evidence in the light most favorable to the prevailing party, the jury could reasonably have reached the verdict that it did." *Berry* v. *Loiseau,* supra, 807–808. Accordingly, "[the trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach their conclusion, and should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles, or as to justify the suspicion that they or some of them were influenced by prejudice, corruption or partiality. . . ." (Citation omitted; internal quotation marks omitted.) *Champagne* v. *Raybestos-Manhattan, Inc.,* 212 Conn. 509, 555, 562 A.2d 1100 (1989).

[22] In *Genovese* v. *Gallo Wine Merchants, Inc.,* 226 Conn. 475, 479–82, 628 A.2d 946 (1993), we held that General Statutes § 31-51bb authorizes an employee who has failed to exhaust the grievance procedures in a collective bargaining agreement to pursue a cause of action in the Superior Court if the cause of action arises under the state or federal constitution or under a state statute. Because the plaintiff's contract claims, in contrast to his claims under 42 U.S.C. § 1983, do not arise under any constitutional or state statutory provision, § 31-51bb does not relieve the plaintiff of his obligation to exhaust the administrative remedies available to him under the collective bargaining agreement.

[23] The defendants also contend that the plaintiff did not have standing, as an individual member of the union, to sue for a breach of the collective bargaining agreement. We need not decide that issue in light of our conclusion that the trial court lacked subject matter jurisdiction over the plaintiff's two common law claims.

Article XXI of the collective bargaining agreement[24] establishes a three-step grievance procedure for employees who have been subjected to disciplinary action, including discharge or suspension. Under that

[24] Article XXI of the collective bargaining agreement between the borough and the plaintiff's union provides:

"ARTICLE XXI - GRIEVANCE PROCEDURE

"Section 21.01. Purpose. The purpose of the grievance procedure is to settle employee grievances as expeditiously as possible.

"Section 21.02. Definitions.

"a. A 'grievance', for the purpose of this procedure, shall mean a claim or dispute arising out of the following:

"1. Application and interpretation of the Articles and Sections of this Agreement.

"2. Discharge, suspension or other disciplinary action.

"3. Interpretation and application of the Rules and Regulations of the Police Department.

"b. A 'grievant' shall mean any employee covered by this Agreement.

"c. A 'day', for purposes of this Article, shall mean a calendar day.

"Section 21.03. Procedure. A grievance shall be processed in accordance with the following three steps:

"Step No. 1. If an employee has a grievance, within seven (7) days of its occurrence, the employee or his representative, if represented, shall submit the grievance in writing to the Police Chief, setting forth the nature of the grievance. Within seven (7) days after receiving such grievance, the Chief shall render his decision in writing to the aggrieved employee or his representative, if the employee is represented. The Chief may meet with the grievant and/or his representative prior to rendering his decision in writing for the purpose of adjusting or resolving the grievance.

"Step No. 2. If the employee is not satisfied with the decision rendered by the Chief, the employee or his representative shall, within seven (7) days of receipt of the Chief's decision, submit the grievance in writing to the Board of Police Commissioners. The Board of Police Commissioners shall consider the grievance at its next regularly scheduled meeting and shall render its decision, in writing, to the employee or his representative within seven (7) days of said meeting.

"Step No. 3. If the employee or his representative is not satisfied with the decision rendered in Step 2, the Union may, within fourteen (14) days of receipt of the Step 2 answer, submit the grievance to the State Board of Mediation and Arbitration for arbitration. The decision rendered by the arbitrator or arbitrators shall be final and binding upon both parties. Said arbitrator or arbitrators shall not have the power to change, modify or otherwise amend this Agreement. The costs associated with the arbitration of any grievance shall be shared equally by the Borough and the Union.

"Section 21.04. Time extensions. Time extensions beyond those stipulated

procedure, an employee who wishes to challenge the imposition of any disciplinary measure must first file a grievance with the chief of police, who is required to render a written decision within seven days of receipt of the grievance. If dissatisfied with the decision of the police chief, the employee may then seek relief from the board, which must consider the matter at its next regularly scheduled meeting and render its decision no later than seven days thereafter.[25] Finally, if the employee does not agree with the board's decision, the employee's union is authorized to submit the grievance to the state board of mediation and arbitration, whose decision is final and binding on the parties.

"It is well settled under both federal and state law that, before resort to the courts is allowed, an employee must at least attempt to exhaust exclusive grievance and arbitration procedures, such as those contained in the collective bargaining agreement between the defendant and the plaintiffs' union. . . . Failure to exhaust the grievance procedures deprives the court of subject matter jurisdiction." (Citations omitted; internal quotation marks omitted.) *Labbe* v. *Pension Commission*, 229 Conn. 801, 811, 643 A.2d 1268 (1994). "The purpose of the exhaustion requirement is to encourage

in this grievance procedure may be arrived at by mutual agreement of both parties concerned and in writing.

"Section 21.05. Discussion. If the parties who are participants in the grievance procedure desire to meet for the purpose of oral discussion, a meeting may be requested and scheduled prior to the submission of the written grievance.

"Section 21.06. In addition to the aforementioned grievance procedure, the affected employee shall have the right to appeal the Chief's decision directly to the Mayor for whatever intervention is deemed appropriate by the Mayor."

[25] In addition, under article XXI, § 21.06, of the collective bargaining agreement, the employee may appeal the police chief's decision "directly to the Mayor for whatever intervention is deemed appropriate by the Mayor." See footnote 24.

the use of grievance procedures, rather than the courts, for settling disputes. A contrary rule which would permit an individual employee to completely sidestep available grievance procedures in favor of a lawsuit has little to commend it. . . . [I]t would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances. If a grievance procedure cannot be made exclusive, it loses much of its desirability as a method of settlement. A rule creating such a situation would inevitably exert a disruptive influence upon both the negotiation and administration of collective [bargaining] agreements." (Internal quotation marks omitted.) Id., 811–12.

Despite the important public policy considerations underlying the exhaustion requirement, we have " 'grudgingly carved several exceptions' from the exhaustion doctrine." *Cahill* v. *Board of Education*, 198 Conn. 229, 241, 502 A.2d 410 (1985). We have recognized such exceptions, however, "only infrequently and only for narrowly defined purposes." *LaCroix* v. *Board of Education*, 199 Conn. 70, 79, 505 A.2d 1233 (1986); see also *Polymer Resources, Ltd.* v. *Keeney*, 227 Conn. 545, 561, 630 A.2d 1304 (1993). One of the limited exceptions to the exhaustion rule arises when recourse to the administrative remedy would be demonstrably futile or inadequate. *O & G Industries, Inc.* v. *Planning & Zoning Commission*, 232 Conn. 419, 429, 655 A.2d 1121 (1995); *Labbe* v. *Pension Commission*, supra, 229 Conn. 814.

The plaintiff contends that his claim falls within this exception and, therefore, that he should be excused for failing to exhaust the remedies available to him under the collective bargaining agreement for two reasons. He contends, first, that it would have been futile for him to have sought reinstatement to active duty through

the contractual grievance mechanism because of the board's animus toward him. Second, he maintains that the administrative remedy available to him would have been inadequate because neither the police chief, the mayor, the board nor the state board of mediation and arbitration was authorized to grant him the relief that he sought for the defendants' allegedly tortious breach of contract, including compensatory and punitive damages, attorney's fees and costs.

The plaintiff's first contention requires little discussion. As we have previously stated, " '[i]t is futile to seek [an administrative] remedy only when such action could not result in a favorable decision and invariably would result in further judicial proceedings.' " *Simko* v. *Ervin*, 234 Conn. 498, 507, 661 A.2d 1018 (1995); *O & G Industries, Inc.* v. *Planning & Zoning Commission*, supra, 232 Conn. 429. In this case, the board, after conducting a hearing on the charges, found *in favor of the plaintiff* and reinstated him to active duty.[26] Moreover, had the plaintiff challenged his suspension under the first step of the grievance procedure, the chief of police might well have reinstated him to active duty immediately.[27] It can hardly be argued, therefore, that recourse to the grievance mechanism would necessarily have been futile.[28]

---

[26] Although the plaintiff claimed that the board was biased against him, two of the board members agreed not to participate in the hearing on the charges. See footnote 11. In addition, the plaintiff would have had the opportunity at the hearing before the board to seek the recusal of any other board member who he believed could not fairly adjudicate the charges filed against him. See, e.g., *LaCroix* v. *Board of Education*, supra, 199 Conn. 85.

[27] The plaintiff has not claimed either that the police chief harbored a bias toward him or that the police chief had otherwise prejudged the issues raised by the plaintiff's suspension.

[28] The plaintiff also raises the alternate argument that even if he were obliged to exhaust his administrative remedies, he should be deemed to have satisfied that requirement. In support of this claim, the plaintiff argues that the board, in addressing the charges filed against him, also necessarily resolved the issue of his suspension, the same question that it would have

With respect to the plaintiff's second argument, we may assume that he is correct in asserting that the grievance provisions of the collective bargaining agreement do not allow for an award of punitive damages, attorney's fees or costs, relief to which the plaintiff might have been entitled upon proof of "wilful, wanton, capricious and illegal" conduct by the defendants.[29] Nevertheless, we are not persuaded that the plaintiff's administrative remedies were inadequate. Had the plaintiff availed himself of his grievance rights under the collective bargaining agreement, he would have received "immediate consideration and review of the very issue of wrongful [suspension] that the plaintiff raises in this action." *LaCroix* v. *Board of Education*, supra, 199 Conn. 84. Indeed, the charges underlying the plaintiff's claim of tortious breach of contract were withdrawn by the board prior to the commencement of the hearings before it. See footnotes 8 and 9. In such circumstances, the administrative remedies available to him cannot fairly be described as deficient. "It is not the plaintiff's preference for a particular remedy that determines whether the remedy . . . is adequate; see, e.g., *Connecticut Life & Health Ins. Guaranty Assn.* v. *Jackson*, [173 Conn. 352, 357, 377 A.2d 1099 (1977)]; and an administrative remedy, in order to be 'adequate,' need not comport with the plaintiffs' opinion of what a perfect remedy would be." *Connecticut Mobile Home Assn., Inc.* v. *Jensen's, Inc.*, 178 Conn. 586, 590, 424 A.2d 285 (1979); see also *Savoy Laundry, Inc.* v. *Stratford*, 32

considered at a second step grievance hearing. The fact is, however, that the plaintiff never invoked the contractual grievance mechanism and its expedited timetable for the resolution of disputes between employer and employee. Moreover, the plaintiff failed to seek relief from the chief of police as mandated under the first step of the grievance procedure. Accordingly, we reject the plaintiff's contention that he did, in effect, exhaust his administrative remedies.

[29] The collective bargaining agreement does not, by its terms, provide a basis for any such relief.

Conn. App. 636, 630 A.2d 159, cert. denied, 227 Conn. 931, 632 A.2d 704 (1993) (administrative remedies available to plaintiff under statute not inadequate, despite fact that complaint sought relief, including punitive damages and attorney's fees, not available under statutory scheme, where essence of plaintiff's claim involved matter within authority vested in administrative agency). Moreover, once the plaintiff had exhausted his administrative remedies, he could then have sought redress in court.[30]

A contrary conclusion would allow an employee covered by a collective bargaining agreement to circumvent the contract's grievance mechanism simply by seeking relief outside the scope of that agreement. Such a result would undermine the state's policy favoring recourse to contract grievance procedures as a means of dispute resolution; see *School Administrators Assn.* v. *Dow,* 200 Conn. 376, 381, 511 A.2d 1012 (1986); *Board of Education* v. *AFSCME,* 195 Conn. 266, 270, 487 A.2d 553 (1985); and would defeat the express intent of the parties to the collective bargaining agreement that the grievance mechanism be utilized to settle such claims and disputes as expeditiously as possible.[31] Thus, as the Appellate Court has recently stated in rejecting a claim indistinguishable from that raised by the plaintiff in this case, "[t]he plaintiff may not choose [his] administrative remedy through the framing of [his] own complaint. If that were possible, the purpose of the exhaustion doctrine would be thwarted." *Savoy Laundry, Inc.* v. *Stratford,* supra, 32 Conn. App. 642. We conclude, therefore, that because the grievance mechanism of the col-

---

[30] We intimate no view, however, as to whether the plaintiff had standing to bring suit under the collective bargaining agreement. See footnote 23.

[31] Article XXI, § 21.01, of the collective bargaining agreement provides that "[t]he purpose of the grievance procedure is to settle employee grievances as expeditiously as possible."

lective bargaining agreement provided the plaintiff with a full, fair and immediate opportunity to challenge the defendants' actions, his claim of an inadequate administrative remedy must fail.

## II

The plaintiff also contends that the trial court improperly set aside the verdict with respect to his procedural due process claim. Specifically, he asserts that the evidence adduced at trial supported a finding that the defendants' actions unfairly deprived him of constitutionally protected property or liberty interests.

"Under *Board of Regents* v. *Roth*, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972), and *Perry* v. *Sindermann*, 408 U.S. 593, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972), a plaintiff claiming due process protection under the Fourteenth Amendment must possess a 'property' or 'liberty' interest that is somehow jeopardized by governmental action, necessitating a pre- or post-deprivation hearing as a safeguard." *Dobosz* v. *Walsh*, 892 F.2d 1135, 1140 (2d Cir. 1989). However, "[t]he Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions." *Bishop* v. *Wood*, 426 U.S. 341, 350, 96 S. Ct. 2074, 48 L. Ed. 2d 684 (1976). "An interest protected or cognizable under the due process clause must have a basis in existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. . . ." (Internal quotation marks omitted.) *Frillici* v. *Westport*, 231 Conn. 418, 437–38, 650 A.2d 557 (1994).

Thus, "[p]roperty interests are more than abstract needs, desires or unilateral expectations of benefits or privileges. Rather, a person must have a legitimate claim of entitlement to a benefit or privilege to have a property

interest in that benefit. . . . Property interests are not created by the Constitution, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." (Internal quotation marks omitted.) *Harkless* v. *Rowe*, 232 Conn. 599, 618, 657 A.2d 562 (1995). Similarly, "under *Paul* v. *Davis*, 424 U.S. 693, [710–12] 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976), government acts defaming an individual implicate a liberty interest only where the individual suffers a related alteration of his legal status or deprivation of a right recognized under state law." *Dobosz* v. *Walsh*, supra, 892 F.2d 1140. Accordingly, "damage to reputation alone is insufficient to establish a claim for harm to a liberty interest . . . . [A] cognizable claim will lie [only] if a plaintiff can show loss of reputation plus some serious additional harm, such as loss of employment, as a result of defamatory remarks by a government official." *Komlosi* v. *New York Office of Mental Retardation & Developmental Disabilities*, 64 F.3d 810, 817 (2d Cir. 1995). With these principles in mind, we turn to the plaintiff's constitutional claims.

## A

Because, under state law, a police officer in the borough of Naugatuck may not be removed from office except for cause,[32] the plaintiff had a constitutionally protected property interest in his continued employment with the department. See *Logan* v. *Zimmerman Brush Co.*, 455 U.S. 422, 430, 102 S. Ct. 1148, 71 L. Ed. 2d 265 (1982) ("[t]he hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause' "); *Clisham* v. *Board*

---

[32] Section 3 of Special Act No. 321 (1953) provides in relevant part that "both members and officers [of the police department of the borough of Naugatuck] . . . shall hold office until reaching retirement because of age or disability, unless sooner removed for cause."

*of Police Commissioners*, 223 Conn. 354, 360–61, 613 A.2d 254 (1992) (Naugatuck police chief who could not be terminated without just cause had protected property interest in employment). At all times during his suspension, however, the plaintiff remained in the employ of the department, and he received full pay and benefits. The plaintiff points to no state law entitlement preventing his suspension with pay, nor has he identified any authority, in this jurisdiction or elsewhere, to support the contention that a public employer who suspends an employee with pay may nevertheless violate due process protections. On the contrary, courts have consistently concluded that a suspension with pay does not implicate an employee's constitutionally protected property interest.[33] See, e.g., *Swick* v. *Chicago*, 11 F.3d 85, 87 (7th Cir. 1993); *Hicks* v. *Watonga*, 942 F.2d 737, 746 n.4 (10th Cir. 1991); *Royster* v. *Board of Trustees*, 774 F.2d 618, 621 (4th Cir. 1985), cert. denied, 475 U.S. 1121, 106 S. Ct. 1638, 90 L. Ed. 2d 184 (1986); *Harrington* v. *Lauer*, 888 F. Sup. 616, 619–20 (D.N.J. 1995); *Gardetto* v. *Mason*, 854 F. Sup. 1520, 1534 (D. Wyo. 1994); *Watkins* v. *McConologue*, 820 F. Sup. 70, 72–73 (S.D.N.Y. 1992); *Weg* v. *Macchiarola*, 729 F. Sup. 328, 337 (S.D.N.Y. 1990); *Gates* v. *Sicaras*, 706 F. Sup. 169, 172–73 (D. Conn. 1989); *Carlsbad Board of Education* v. *Harrell*, 118 N.M. 470, 477, 882 P.2d 511 (1994). We agree with these decisions and conclude that the plaintiff's property interest in his continued employment was properly safeguarded by virtue of the fact that he was fully compensated during his suspension.

Although the plaintiff concedes that he received full pay during the entirety of his suspension, he claims

---

[33] In fact, the United States Supreme Court has strongly suggested that due process rights are not implicated when a public employee with a legally cognizable property interest is suspended with pay. See *Cleveland Board of Education* v. *Loudermill*, 470 U.S. 532, 544–45, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).

that his property rights were nevertheless implicated because he was deprived of certain other employment opportunities and benefits during that period. In particular, he contends that he lost the opportunity to seek a promotion to deputy chief and to receive private duty wages and the personal use of a police vehicle. The plaintiff, however, has failed to establish a legitimate claim of entitlement to any of these benefits or opportunities; neither the hope for professional advancement[34] nor a unilateral anticipation of possible job-related perquisites gives rise to a constitutionally protected property interest. See *Gates* v. *Sicaras,* supra, 706 F. Sup. 172. Because the constitutional guarantees of due process apply only when the state "seeks to remove or significantly alter [an individual's] protected status"; *Paul* v. *Davis,* supra, 424 U.S. 711; the plaintiff cannot prevail on this claim of a constitutional deprivation.

Furthermore, even if the plaintiff's suspension with pay did carry constitutional ramifications, we are satisfied that the postsuspension hearing was adequate to safeguard his rights. "The United States Supreme Court [has] set forth three factors to consider when analyzing whether an individual is constitutionally entitled to a particular judicial or administrative procedure: 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute

---

[34] We note that the position of deputy chief of police remained vacant as of the date of the plaintiff's return to active duty. Because the plaintiff was then free to seek an appointment to that position, he cannot reasonably claim that he was deprived of any promotional opportunity as a result of his suspension.

procedural requirement would entail.' *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)." *Scinto* v. *Stamm*, 224 Conn. 524, 535, 620 A.2d 99, cert. denied, 510 U.S. 861, 114 S. Ct. 176, 126 L. Ed. 2d 136 (1993). In this case, the interest of the plaintiff affected by the suspension was his desire to remain on the job. Though not without significance, the plaintiff's preference to remain on active duty can hardly be characterized as overriding in light of the borough's strong interest in the efficient administration of the police department, the need for public confidence in its police force and the hearing rights afforded the plaintiff after his suspension. Thus, while an employee with an enforceable expectation of continued public employment must be given the opportunity for a hearing prior to *termination* of that employment; *Cleveland Board of Education* v. *Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985); this plaintiff had no such constitutional entitlement in advance of his suspension with full pay.[35] See, e.g., *Watkins* v. *McConologue*, supra, 820 F. Sup. 73; *Weg* v. *Macchiarola*, supra, 729 F. Sup. 338.

## B

The plaintiff also contends that the defendants' actions adversely affected his reputation, thereby depriving him of a constitutionally protected liberty interest.[36] We conclude that because the defendant has failed to prove a deprivation of constitutional magnitude, this claim also must fail.

[35] We need not reach the issue of whether, or in what circumstances, a public employee with a constitutionally protected employment interest may be entitled to a hearing prior to a suspension without pay.

[36] At trial, the plaintiff introduced numerous newspaper articles that reported, among other things, alleged corruption in the department and the board's actions against the plaintiff.

"Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin* v. *Constantineau*, 400 U.S. 433, 437, 91 S. Ct. 507, 27 L. Ed. 2d 515 (1971). "[T]he remedy mandated by the Due Process Clause of the Fourteenth Amendment is an opportunity to refute the charge. . . . The purpose of such notice and hearing is to provide the person an opportunity to clear his name . . . ." (Citations omitted; internal quotation marks omitted.) *Codd* v. *Velger*, 429 U.S. 624, 627, 97 S. Ct. 882, 51 L. Ed. 2d 92 (1977); *Statewide Grievance Committee* v. *Presnick*, 215 Conn. 162, 171, 575 A.2d 210 (1990). "However, under *Paul* v. *Davis*, [supra, 424 U.S. 710–12], government acts defaming an individual implicate a liberty interest only where the individual suffers a related alteration of his legal status or deprivation of a right recognized under state law." *Dobosz* v. *Walsh*, supra, 892 F.2d 1140. "For instance, a liberty interest is implicated when a plaintiff can show both harm to his reputation and serious damage to his prospects for future employment in his profession . . . or defamation in connection with a termination of public employment." (Citations omitted.) *Komlosi* v. *New York Office of Mental Retardation & Developmental Disabilities*, supra, 64 F.3d 817. "Because dismissal from employment for stigmatizing reasons can imperil the opportunity to earn one's living in one's profession, the liberty interest cause of action has most pointedly focussed on stigmatizing statements in the context of dismissal." *O'Neill* v. *Auburn*, 23 F.3d 685, 691 (2d Cir. 1994).

The plaintiff has not demonstrated that the defendants' actions so stigmatized him as to make it unlikely that he will be able to obtain employment in his chosen field. On the contrary, not only did he retain his position,

with full pay, during the entire period of his suspension, he was eventually reinstated to active duty as administrative captain—a position from which he may not be removed without just cause. Moreover, the record is devoid of any evidence that the plaintiff would be unable to obtain employment elsewhere if he sought to do so. Thus, the trial court properly concluded that the plaintiff failed as a matter of law to prove that he was deprived of a constitutionally protected liberty interest.[37]

### III

The plaintiff also contends that the trial court improperly set aside the verdict with respect to his substantive due process claim that he was injured by the defendants' "wilful, arbitrary and capricious" actions. Our conclusion that the defendants' conduct did not implicate any constitutionally protected property or liberty interest necessarily resolves the plaintiff's substantive due process claim against him. "If a claimant does not establish a constitutionally protected interest, the due process analysis ceases because no process is constitutionally due for the deprivation of an interest that is not of constitutional magnitude. If, however, a due process claimant does establish a constitutionally protected interest, he or she may then seek to establish other required elements of the due process claim, such as reliance on inappropriate procedures or arbitrary or oppressive conduct. See generally *Zinermon* v. *Burch*, 494 U.S. 113, 127–28, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990) (procedural due process); *Daniels* v. *Williams*, 474 U.S. 327, 331–32, 106 S. Ct. 662, 88 L. Ed. 2d 662

---

[37] Furthermore, even if the plaintiff's treatment by the defendants had raised issues of constitutional proportions, he was afforded a name-clearing hearing as required by the due process clause. *Komlosi* v. *New York Office of Mental Retardation & Developmental Disabilities*, supra, 64 F.3d 817–18; *Dobosz* v. *Walsh*, supra, 892 F.2d 1140–41.

(1986) (substantive due process)." *Kelley Property Development, Inc.* v. *Lebanon*, 226 Conn. 314, 322, 627 A.2d 909 (1993). Because the plaintiff failed to establish the deprivation of a constitutionally protected property or liberty interest, the trial court properly set aside the verdict with respect to his substantive due process claim.

## IV

The plaintiff next claims that the evidence was sufficient to support that portion of the verdict determining that the defendants' actions abridged his rights under the equal protection clauses of the federal and state constitutions and, accordingly, that the trial court improperly set aside the verdict with respect to that count, as well. We agree with the trial court that the evidence was not sufficient to establish an equal protection violation.

"The concept of equal protection [under the state and federal constitutions] has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged. . . ." (Internal quotation marks omitted.) *State* v. *Metz*, 230 Conn. 400, 423, 645 A.2d 965 (1994); see also *Broadley* v. *Board of Education*, 229 Conn. 1, 8, 639 A.2d 502 (1994). When, as here, a claimed equal protection violation arises from the alleged selective application of a facially neutral state regulation, it must be shown that "(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person. *Wayte* v. *United States*, 470 U.S. 598, 608–609, 105 S. Ct. 1524,

1531–32, 84 L. Ed. 2d 547 (1985); *LeClair* v. *Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980), cert. denied, 450 U.S. 959, 101 S. Ct. 1418, 67 L. Ed. 2d 383 (1981)." *FSK Drug Corp.* v. *Perales*, 960 F.2d 6, 10 (2d Cir. 1992); accord *Terminate Control Corp.* v. *Horowitz*, 28 F.3d 1335, 1352 (2d Cir. 1994); *Schnabel* v. *Tyler*, 230 Conn. 735, 761, 646 A.2d 152 (1994).

The plaintiff's claim of an equal protection violation is predicated primarily on his assertion that he was treated differently from another supervisory officer, William Long. In support of this contention, the plaintiff adduced evidence at trial that Long was never subjected to any disciplinary action by the board even though he, like the plaintiff and other members of the department, had been mentioned in the report of a state grand juror investigating allegations of official misconduct in the borough.[38] The plaintiff points to no other evidence tending to prove that Long was deserving of administrative action by the board.

The plaintiff's proof fell far short of satisfying the requirement that he, "*compared with others similarly situated*"; (emphasis added) *FSK Drug Corp.* v. *Perales*, supra, 960 F.2d 10; was selectively treated. No evidence whatsoever was introduced at trial to demonstrate that Long had committed any improprieties warranting review or discipline by the board, or that any formal accusations of wrongdoing had ever been made against him. In the absence of any such evidence, the jury could not reasonably have concluded that Long and the plaintiff were equally deserving of administrative action. Consequently, no equal protection barrier existed prohibiting the board from treating the two men differently.

[38] The grand jury report did not result in the filing of charges against either Long or the plaintiff.

Furthermore, the plaintiff failed to establish that any other similarly situated member of the department had received more favorable or more lenient treatment by the defendants than he had received.[39] In fact, the undisputed evidence revealed exactly the opposite: immediately prior to its hearings on the allegations against the plaintiff, the board, also acting on the basis of charges stemming from an investigation by a borough attorney and after a lengthy series of hearings, voted to *dismiss* the chief of police, Dennis Clisham.[40] The sanction imposed by the board against Clisham, which was much more serious than its actions against the plaintiff, belies the plaintiff's claim of disparate treatment. Thus, the evidence at trial, far from establishing that the plaintiff had been subjected to unequal treatment, convincingly demonstrated that he had not been singled out for harsh treatment by the defendants. Because the verdict with respect to the plaintiff's equal protection claim was palpably against the evidence, the trial court also properly set aside that portion of the verdict.

[39] The plaintiff did present evidence that no disciplinary action was taken against a detective who allegedly failed to perform certain of his police duties under the direction of the plaintiff, or against a police mechanic who, also under authorization from the plaintiff, purportedly performed certain repairs on the plaintiff's personal vehicle while on official duty. The plaintiff, however, does not persuasively contend that these allegations support his equal protection claim. First, the allegations were never proven. Second, in each case, the alleged actions of the two department employees were purportedly undertaken at the direction of the plaintiff, their supervisor. Finally, neither the detective nor the police mechanic held a supervisory position similar to that of the plaintiff.

[40] In December, 1987, Clisham was notified by the board that he was being charged with eleven violations of the rules and regulations of the Naugatuck police department. Hearings on those charges were conducted by the board from December 15, 1987, until February 14, 1989, at which time the board dismissed Clisham as police chief. Clisham appealed from the board's decision to the Superior Court, claiming that certain members of the board had prejudged his case, and the trial court dismissed his appeal. On appeal to this court, we reversed the judgment of the trial court, concluding that Clisham was entitled to a new hearing before an impartial panel. *Clisham* v. *Board of Police Commissioners*, supra, 223 Conn. 354.

The judgment is affirmed.

In this opinion PETERS, C. J., CALLAHAN and NOR-COTT, Js., concurred.

BERDON, J., dissenting. It is obvious, as demonstrated by its award of $550,000 for compensatory and punitive damages, that the jury in this action was outraged with the political vendetta carried out by the defendant board of police commissioners (board) against the plaintiff, police officer Thomas Hunt.

I agree that, generally, an employee who is covered by a collective bargaining agreement must, except as provided by statute,[1] first challenge an employment action through the grievance procedure provided in the agreement. But, as noted by the majority, this court has " 'grudgingly carved several exceptions' from the exhaustion doctrine." (Emphasis added.) Cahill v. Board of Education, 198 Conn. 229, 241, 502 A.2d 410 (1985). " 'Among the exceptions is where recourse to the administrative remedy would be futile or inadequate . . . .' An administrative remedy is futile or inadequate if the agency [or grievance procedure] is without the authority to grant the requested relief." (Citations omitted.) Cannata v. Dept. of Environmental Protection, 215 Conn. 616, 628, 577 A.2d 1017 (1990).

In this case, with respect to the two contract counts of the complaint, the plaintiff sought compensatory and punitive damages for breach of contract and tortious interference with his contractual rights. Predicated on his suspension as a police officer and the groundless

[1] General Statutes § 31-51bb provides in relevant part: "No employee shall be denied the right to pursue, in a court of competent jurisdiction, a cause of action arising under the state or federal constitution or under a state statute solely because the employee is covered by a collective bargaining agreement." See Genovese v. Gallo Wine Merchants, Inc., 226 Conn. 475, 481, 628 A.2d 946 (1993).

allegations of misconduct made by the members of the board, the plaintiff had a reasonable basis for pursuing those causes of action and, as the majority concedes, the administrative process could not have provided the plaintiff with punitive damages.[2] Because the administrative process was incapable of providing adequate relief, merely pursuing the contractual grievance procedure would have been an ineffectual act. Therefore, although the plaintiff simultaneously pursued his administrative remedies,[3] he was exempt from the requirement mandating the exhaustion of administrative remedies prior to invoking the jurisdiction of the courts.

Notwithstanding its concessions, the majority believes that "[a] contrary conclusion would allow an employee covered by a collective bargaining agreement to circumvent the contract's grievance mechanism simply by seeking relief outside the scope of that agreement." I disagree. Pursuant to Practice Book §§ 142 and 143, an action brought in the Superior Court, when the administrative remedy is adequate, can be summarily dismissed.[4] Additionally, an employee who brings vexatious litigation—that is, a suit initiated without probable cause—may be subject to liability. *Vandersluis* v. *Weil*, 176 Conn. 353, 356, 407 A.2d 982 (1978). Therefore, the continued recognition and application of the "inadequate remedy" exception will not improperly flood the Superior Court with collective bargaining agreement disputes.

[2] Moreover, the majority acknowledges that the plaintiff could have pursued additional relief after the administrative process was completed.

[3] On March 18, 1987, the plaintiff was formally charged with several allegations of misconduct. The board then waited two years before beginning the administrative hearings. After fifteen months of waiting, on June 15, 1988, the plaintiff commenced this action.

[4] A motion to dismiss is properly granted when the court lacks jurisdiction over the subject matter, e.g., when the administrative remedy provided under the collective bargaining agreement is adequate.

In this case, the plaintiff alleged a contractual violation and tortious breach of contract. The plaintiff claimed, and the jury believed, that he was the target of a political vendetta and that the board did not have reasonable cause to prohibit him from returning to work, nor did it have reasonable cause to suspend him. In September, 1986, after being absent from work because of a stress disorder, the plaintiff was not allowed to return to work because of alleged charges against him for violating departmental rules and regulations. The plaintiff was eventually presented, though never formally charged, with these allegations in November, 1986.[5] Notwithstanding these charges, in February, 1987, the board voted to allow the plaintiff to return to work. The chairperson of the board, however, failed to take action with respect to this vote. Consequently, on March 2, 1987, the plaintiff was compelled to initiate a writ of mandamus to compel the chairperson to act. Finally, on March 17, 1987, the plaintiff was allowed to return to work. On March 18, 1987, the board voted to charge the plaintiff formally with several counts of misconduct and to suspend him with pay.[6]

---

[5] These charges included: (1) being absent without leave; (2) utilizing and submitting departmental forms while absent; (3) filing unsupported workers' compensation claims; (4) failing to register vehicles as part of his duties as administrative captain; (5) working as a real estate agent while absent; (6) psychiatric report noted that "[the plaintiff] feels that he might kill somebody"; and (7) failing to report to a physician within seven days of being absent.

[6] The plaintiff was formally charged with the following misconduct: (1) assisting an officer to write a statement against other officers; (2) making threats that affect the safety of other officers; (3) failing to supervise subordinate officers; (4) failing to maintain police vehicles; (5) failing to keep maintenance records and documentation of maintenance schedules; (6) having a police department mechanic perform work on his personal vehicle while the officer was on duty; (7) failing to register two police vehicles and to replace recovered license plates on the vehicles; (8) permitting an officer to take a police vehicle to the officer's private home while he was at home while on duty; (9) failing to account for $8000 worth of auto parts; and (10) failing to return to work within time periods prescribed in the collective bargaining agreement.

Approximately one year later, a substitute set of charges was brought against the plaintiff.[7] Ultimately, in August, 1989, the plaintiff was exonerated of all administrative charges.

For these reasons, it was proper for the plaintiff to seek punitive damages. Because punitive damages were not available to the plaintiff under the collective bargaining agreement, the majority's reliance on the traditional exhaustion requirement is misplaced and the plaintiff was not required to exhaust the agreement's grievance procedure before instituting his action.

I also disagree with the majority's analysis of the plaintiff's claim under 42 U.S.C. § 1983, regarding his liberty interest in his reputation. In my opinion, the plaintiff has properly alleged a due process violation because a jury could reasonably find that his reputation was tarnished due to the actions taken by the board against him. As a result of the board's actions, 106 newspaper articles were written about the plaintiff and the allegations of misconduct brought against him. Without a doubt, a jury could have reasonably concluded, and did in fact conclude, that these articles damaged his reputation in the community and affected his legal status.

I am aware that the Supreme Court of the United States in *Paul* v. *Davis*, 424 U.S. 693, 701–10, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976), narrowed the holding of *Wisconsin* v. *Constantineau*, 400 U.S. 433, 437, 91 S. Ct. 507, 27 L. Ed. 2d 515 (1971), with respect to the protection of reputation.[8] The court in *Paul* held that

---

[7] On May 31, 1988, the board presented the plaintiff with a revised set of charges. The charges of forcing another officer to sign a statement against her will, failing to account for $8000 in auto parts and allowing an on-duty officer to keep a police vehicle at his home were deleted from the substitute set of charges, while two charges of forgery were added.

[8] The United States Supreme Court in *Wisconsin* v. *Constantineau*, supra, 400 U.S. 437, held that "a person's good name, reputation, honor, or integrity" is protected under the due process clause of the federal constitution.

to succeed under a § 1983 action for damages for injury to reputation, there must be, in addition to defamation, some "right or status previously recognized by state law [that] was distinctly *altered* or extinguished." (Emphasis added.) *Paul* v. *Davis*, supra, 711; see *Goss* v. *Lopez*, 419 U.S. 565, 574–76, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975) (suspension from school based upon charges of misconduct could trigger procedural guarantees of fourteenth amendment). In this case, not only did the board subject the plaintiff to numerous allegations of misconduct, of which he was ultimately exonerated, but for three years he was suspended from his position as assistant chief of police, a position from which he could not be removed except for just cause. Although the plaintiff received his salary during the period of suspension, he was nevertheless deprived of his official position, thereby satisfying the stricter standards of *Paul*.

Notwithstanding the satisfaction of the *Paul* standards, Justice Brennan's dissent in that case appropriately addresses the majority's analysis of the plaintiff's injury: "I have always thought that one of this Court's most important roles is to provide a formidable bulwark against governmental violation of the constitutional safeguards securing in our free society the legitimate expectations of every person to innate human dignity and sense of worth. It is a regrettable abdication of that role and a saddening denigration of our majestic Bill of Rights when the Court tolerates arbitrary and capricious official conduct branding an individual as a criminal without compliance with constitutional procedures designed to ensure the fair and impartial ascertainment of criminal culpability. Today's decision must surely be a short-lived aberration." *Paul* v. *Davis*, supra, 424 U.S. 734–35.

Accordingly, I respectfully dissent.