[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Procedural Posture
The plaintiff, L. F. Pace Construction, Inc. (Pace), brought the present action against the Department of Public Works (DPW) following the termination of a contract to construct an addition to Memorial Hall at the campus of Western Connecticut State University (WESCON), a state run educational institution. The action seeks, inter alia, a declaratory judgment declaring the termination of that contract for cause null and void because such termination was accomplished without affording plaintiff (Pace) a pre-termination hearing in violation of its due process rights as guaranteed under Article First, section 10 of the Connecticut Constitution. DPW filed a motion to dismiss this action on the grounds that this court lacked subject matter jurisdiction inasmuch as the action was barred by the doctrine of sovereign immunity and Pace had no constitutionally protected property interest in said contract. That motion was denied by the this court in a memorandum of decision dated November 18, 1996.[1]
An evidentiary hearing which is the subject of this memorandum followed to determine if in fact the plaintiff was given all the process it was due under the aforementioned section of our constitution. The court here concludes after a full hearing on that subject that it was not afforded due process for the reasons hereinafter set forth.
Operative Facts
Pace was first alerted to any serious concerns over its performance of the contract in question in September, 1995 as a result a conversation with the project coordinator (Dunn) He told Lawrence Pace "they" meaning the University officials and the architect were meeting with a view toward getting rid of Pace apparently due the many construction delays which had occurred.[2] In fact, according the Nancy Griffin, the Director of Student Life at the University, the University was dissatisfied with Pace's performance from the inception of the contract as a result of the various delays and inconveniences suffered by the University which were believed to be the fault of Pace.
On March 1, 1996 DPW's bureau chief sent Pace a letter[3]
formally expressing DPW's concerns over the construction delays and Pace's failure to comply with various sections of the contract specifications, and in particular, with the compression CT Page 149 specifications of a concrete slab which was poured in December, 1995. This letter also warned that if all issues were not resolved to the complete satisfaction of DPW by March 10, 1996 the contract "shall be terminated".
Several days later Pace responded to the March 1st letter[4] requesting a meeting to discuss these claims which it disputed. Pursuant to this request a meeting was arranged by telephone but the date was subsequently changed to March 19th. Except for the content of the March 1st letter itself, Pace was not otherwise informed of the purpose of meeting on March 19th nor was it given any advance agenda of the meeting despite the opportunity to do so as evidenced by a DPW fax message on MAR 15, 1996.[5] More importantly, there was absolutely no indication in any prior communication between the parties that the March 19th meeting was to serve as a pre-termination hearing. Although DPW throughout this hearing, has characterized the March 19th meeting as a pre-termination hearing, Pace was under the impression its purpose was to merely resolve the matters referred to in the March 1st letter.
The meeting was held in the commissioner's office and was informal. In addition to the attorneys representing each party,[6] present at the meeting was the commissioner, DPW's bureau chief, project coordinator and architect, two university representatives, Lawrence and Mark Pace, the principal officers of the plaintiff corporation and Pace's project engineer. There was no agenda distributed at the meeting nor any structure to it. It began with the commissioner informing the group assembled that he would not be able to devote too much time to this meeting as he had other appointments scheduled. He then asked Lawrence Pace to speak to the issues since he had requested the meeting
Taking the commissioner's opening caveat into consideration, Lawrence Pace touched briefly on all of the matters discussed in the March 1st letter, but the bulk of the discussion revolved around the failure of the concrete slab to meet compression specifications and the need for its removal. Pace's project engineer attempted to explain why the tests showing non compliance were invalid and referred to other tests that disputed DPW's claims. The commissioner invited Pace to furnish him with written documentation of its claim regarding the faulty testing procedures from the concrete supplier which Pace did two days later. There was apparently little or no response from the DPW staff members present at the meeting to Pace's denials or CT Page 150 explanations. No one was assigned to take notes of the meeting nor was any stenographic or tape recorded record made of the meeting. The entire meeting lasted about 30 minutes.
As the meeting ended, the commissioner assured Pace that he would "get back to them" and the Pace representatives left the room. The commissioner asked the representatives of the university and DPW's architect, the two parties Pace believed were plotting to remove it from the project, to remain. In Pace's absence a short meeting ensued between these people and the commissioner. No record was made of this meeting nor was Pace ever informed of the nature of this meeting.
On the day before the March 19th meeting DPW's project coordinator (Dunn) sent Pace a letter indicating DPW's conclusions regarding concrete test results and their recommendation that the slab be removed and a removal plan be submitted by a qualified structural engineer. Attached to this letter were copies of letters from DPW's architectural consultants and its project engineer presumably supporting DPW's recommendations. Pace did not receive this letter (or the attachments) until after the March 19th meeting.[7]
Consequently, Pace was unaware of DPW's latest position on the concrete issue prior to the March 19th meeting.
Following the meeting Pace received a letter dated March 26th from the commissioner referencing the contract violations spelled out in the March 1st letter and informing Pace that the O G test results (which were favorable to Pace) "proved to be unacceptable". He further indicated that after review of all relevant documents he concluded that the concrete slab had to be removed and directed Pace to remove the slab and submit a removal plan as well as a completion schedule by April 8, 1996 and that Pace's failure to so comply would result in DPW ". . . exercising all contractual and statutory rights and remedies up to and including termination. . . ." This letter was unclear as to the nature or source of the proof of unacceptability of the O G test results. Nor did the commissioner offer Pace an opportunity to refute this "proof."[8] Furthermore, the time frame within which Pace was to submit a removal plan certified by a structural engineer was arrived at unilaterally without any consultation with Pace who was to secure the services of such person.
Pace responded to this communication with a hand delivered letter dated April 4, 1996[9] stating that although it denied CT Page 151 any responsibility for the delays and disagreed with the commissioner's assessment of the slab issue, it would nevertheless provide a removal plan for DPW's approval by April 17th and provide a completion schedule following acceptance of the removal plan all in the interest of moving the project forward. It also indicated that it was proceeding under protest with regard to the slab issue and would hold DPW liable should Pace's position ultimately prove to be correct.
After receiving this letter, the commissioner officially notified Pace by letter[10] that the contract was terminated for cause specifying the relevant sections of the contract applicable and ordered Pace to leave the site immediately pursuant to the default provisions of the contract. The letter recited the specific violations giving rise to the termination including an incorrect conclusion that the 56 day compression test and a "Swiss Hammer" test proved the slab didn't meet contract specifications.[11]
The termination of the (WESCON) contract has had a significant impact on Pace's other business operations and future business prospects. In the last six years almost 100% of Pace's business has been in the public sector. Only since the termination of the WESCON contract has Pace actively pursued business in the private sector. Since February, 1996 Pace has lost several contracts in the public sector due primarily to the termination of the WESCON contract. Its efforts at obtaining business in the private sector has met with little success Pace has gone from a profitable and respected company prior to the termination to an unprofitable company with a questionable reputation following the termination. Pace's bonding capacity — the maximum amount of bonding it can secure on an aggregate basis — prior to February, 1996 was in the vicinity of $18 to $20 million dollars Since February, 1996 its bonding capacity has been cut in half. The public contracting and the bonding industry is a relatively small niche industry. Consequently, information of a reputational nature travels rapidly within the industry. In the present case, Pace's difficulties with the WESCON termination is well known among all major surety companies and many of Pace's sub-contractors and suppliers. As a result it has been extremely difficult for Pace to continue to effectively manage another pending construction project with DPW or to acquire responsible sub-contractors and deal with its suppliers. CT Page 152
As a proximate result of this termination and the financial repercussions of DPW withholding payments on requisitions for work already completed[12] Pace's reputation as a responsible and bondable contractor has deteriorated to the point where it now cannot obtain bonding for any construction project. This has effectively prevented it from bidding on any public or private contract which requires bonding. According to Pace's bonding agent[13] Pace is no longer able to obtain any bid or performance bonds due primarily to the termination of the (WESCON) contract. Furthermore, it is not now in Pace's best interests to even bid on public contracts until the difficulties with DPW are resolved in its favor because inevitable refusals from the sureties will only exacerbate its already damaged professional reputation. Moreover, Pace will be unable to secure bonding for future projects until such time as the WESCON contract is favorably resolved. Three factors are critical to obtaining a bond commitment the contractor's financial condition, its professional reputation and its track record for performance Between 1993 and March of 1996 Pace handily met each of these qualifications. Due the this termination for cause Pace can now meet none of them. Although a favorable resolution of the WESCON contract would be a significant first step in returning Pace to a bondable status, it would not result in an immediate rebound because of the significant downturn in its financial condition. But clearly without a favorable resolution of the WESCON termination, there is no question but that Pace faces almost certain extinction from the construction business.
The Law
As previously observed, the court has already concluded in its November 18th memorandum of decision that the plaintiff had a property interest in the continuation of the contract in question and therefore was entitled to some form of pretermination hearing under Article First, section 10 of the Connecticut ConstitutionSignet Const. Corp. v. Borg, 775 F.2d 486, [775 F.2d 486], 490 (2nd Cir, 1985). Although the plaintiff did not emphasize its claim regarding damage to reputation in the motion to dismiss and the court did not specifically address that issue, the plaintiff in the instant hearing again raises the reputation issue as an additional protected interest afforded due process protection under the Connecticut constitution. The court now addresses this issue by concluding that the plaintiff is correct in its contention that reputation is indeed an interest warranting state procedural due process protection. Reputation when coupled with some serious CT Page 153 additional harm such as loss of employment has been held to warrant due process protection. Hunt v. Prior, 236 Conn. 421,437, 441 (1996). The court specifically observed:
 "Where a person's good name, reputation, honor or integrity is as stake because of what the government is doing to him, notice and opportunity to be heard is essential" citing Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 SCt 507, 27 L.Ed.2d 515 (1971). Hunt v. Prior, supra, 441.
The court went on to define what it meant by "opportunity" in this context: "[T]he remedy mandated by the Due Process Clause of the Fourteenth Amendment is an opportunity to refute thecharge. . . ." Id. (Emphasis added.)
Having made this determination the next inquiry is whether or not the process which was in fact employed complied with the mandate of Article First, section 10 of our constitution.Cleveland Board of Education v. Loudermill, 470 U.S. 532, 541,105 SCt 1493 (1985) Tedesco v. Stamford, 222 Conn. 233, 242 (1992). It is appropriate at this point to observe that not every case where procedural due process is required is a formal trial type hearing also required. Procedural due process is a flexible concept. Therefore the type of due process procedure that is required depends upon the circumstances of the parties, the nature of the dispute and the time available. Goldberg v. Kelley,397 U.S. 397 U.S. 254, 268-69, 90 S.Ct 1101, 25 L.Ed.2d 287 (1970). Nevertheless, the fundamental requirement of any such process is the opportunity to be heard at a meaningful time and in a meaningful manner Mathews v. Eldridge, 424 U.S. 319, 333,96 S.Ct 893, 47 L.Ed.2d 18 (1976).
The constitutional sufficiency of the process under review generally requires consideration of three distinct factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional procedural safeguards; and (3) the government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail. Mathews v.Eldridge, 424 U.S. 319, 335, 96 S.Ct 893, 47 L.Ed.2d 18 (1976); see also, Tedesco v. Stamford, supra, 243. Applying these factors to the instant case, this court concludes that the plaintiff didnot receive all the process it was due. CT Page 154
The Private Interest Affected
In the present case the private interests at stake are Pace's interest in the continuation of the construction contract in question and the preservation of its business reputation in order that it may be realistically considered for future state contracts. These are legitimate property interests that warrant procedural due process protection. Unger v. National ResidentsMatching Program, 928 F.2d 1392, [928 F.2d 1392], 1399 (3rd Cir, 1991); S D Maintenance Co., Inc.,844 F.2d 962, [844 F.2d 962], 968 (2nd Cir, 1988); Huntv. Prior, supra, 441.
The critical test is not whether Pace will in fact be denied future state contracts because it was terminated for cause, but whether there is a likelihood of that happening. Hunt v. Prior,supra, 441. That is, the extent to which the decision to terminate had potential to inflict significant harm upon the plaintiff's protected property interest. Mathews v. Eldridge,supra, 341-342.
In this case the very the nature of the claimed contractual violations set forth in the termination letter went to the essence of any construction contract — the ability to prosecute the work in timely fashion, to stay on schedule, to provide adequate manpower, to generally comply with contract plans and specifications and specifically to properly construct a concrete slab. This document remains in the records of the agency and is therefor easily accessible for future reference. But aside from this, any contractor submitting a bid for a state construction project is required to disclose whether it has failed to complete a contract in the past on a standard "bidder's qualification statement.[14]. More importantly, the awarding authority is statutorily mandated to consider these very factors in selecting any successful bidder. Section 4b-91 of the CGS provides in pertinent part:
 "(a) Every contract for the construction, reconstruction, alteration, remodeling, repair or demolition of any public building . . . shall be awarded to the lowest responsible and qualified general bidder . . ." (emphasis added)
And section 4-92 defines "lowest responsible and qualified bidder" as:
". . . the bidder whose bid is the lowest of those bidders CT Page 155 possessing the skill, ability and integrity necessary to faithful performance of the work based on objective criteria considering past performance and financial responsibility. . . . In considering past performance the awarding authority shall evaluate the skill, ability and integrity of the bidders in terms of the bidder's fulfillment of contract obligations and of bidder's experience or lack of experience with projects of the size of the project for which bids are submitted" (emphasis added)
And finally, section 4b-94 states that:
 ". . . the awarding authority shall reserve the right to reject any or all such general bids, if (1) the awarding authority determines that the general bidder or bidders involved are not competent to perform the work as specified, based on objective criteria established for making such determinations, including past performance
and financial responsibility." (emphasis added)
By statutory definition "past performance" is a significant measure of a general bidder's ability to "fulfill contractobligations". In this case the awarding authority is the commissioner himself who issued the termination letter. In any future bid submitted by Pace, it is highly unlikely that the commissioner or his successor would disregard his own findings which are highly critical of Pace's performance. Considering these factors, especially the pervasive scope of the alleged contract violations, the potential for harm to the plaintiff is extraordinary. The likelihood of Pace being awarded another state construction contract on this record can be reasonably estimated to be between slim and none. Consequently, the plaintiff's interests affected by the decision to terminate for cause not only impacts the continuation of the contract in question, but extends to its long term ability to do business with the State of Connecticut.
Aside from the impact of the statutory mandate, there is the potential impact upon Pace's professional reputation. Pace faces another hurdle even before it can be in a position to submit a bid on any contract requiring bonding.[15] It must submit a bid bond and ultimately a performance bond. Critical to obtaining these bonds is, inter alia, the contractor's track record for completing contracts and his professional reputation in the industry. The termination of a construction contract for cause CT Page 156 directly and adversely affects these factors and in turn the contractor's ability to obtain the bonding necessary to qualify him to be a successful bidder for any state project. In the case at bar, the plaintiff's reputation has been severely damaged by the action of DPW in terminating the WESCON contract for cause. As a result, Pace is presently unable to obtain any bonding for any project — public or private. More importantly, it is likely that it will never be able to obtain bonding if the termination for cause remains in effect. Because Pace conducts its business almost entirely in the public sector, such termination, if upheld, will effectively destroy its ability to make a livelihood from public or private construction. In short, the termination for cause has so besmirched it's professional reputation as to put it out of business. Such result coupled with the potential loss of livelihood is an interest which clearly falls within the purview Article First, section 10 of our constitution. Hunt v.Prior, supra, 441.
 The Risks of Erroneous Deprivation the Value of additional Safeguards
In the present case DPW claims that the meeting on March 19th constituted all the process the plaintiff was entitled to under the circumstances. Those circumstances included the fact that Pace was never (until this hearing) informed that the purpose of the March 19th meeting was to evaluate whether or not the contract was to be terminated;[16] was not given an agenda prior to that meeting; there was no record made of the meeting; insufficient time was given Pace to effectively rebut each of the claims of the DPW field staff; an ex parte after-meeting was conducted by the commissioner with what might reasonably be considered as Pace's staunchest adversaries also without a record being made; that Pace was not permitted to refute DPW staff evaluations of favorable compression tests which it was invited to submit subsequent to the meeting and that it was not able to have any input into the time factors in submitting a removal plan both of which were apparently critical to the commissioner's decision to terminate; and finally, that some of the data upon which the commissioner based his opinion to terminate were admittedly inaccurate or untrue.
Most disturbing about the process employed in this case is the inadequacy of notice. Notice to comply with procedural due process must be sufficient to fairly alert the claimant to the nature and extent of the claims against him so that he may CT Page 157 address his arguments to those considered important to the decisionmaker. Goldberg v. Kelly, supra., 269. DPW argues that the March 1st letter did serve as adequate notice. The court disagrees. That letter was admittedly intended to be a "cure" letter — a letter routinely sent to induce compliance, not intended as a notice of intent to terminate.[17] This letter may have been a first step in the termination process, but it was less than adequate to alert Pace to the immediacy of the situation. Even Pace did not appreciate the urgency which DPW now attaches to this missile. This is demonstrated by Pace's response to that letter [Ex D] requesting a meeting to discuss the disputed issues. Furthermore, Pace apparently did not believe that these issues were of such moment as to involve the commissioner as its request did not mention the commissioner's involvement in any way.[18]
There were numerous contract violations specified in the March 1st letter which were divided into two basic categories: delays in job completion and lack of conformance to plans and specifications. DPW here argues that all violations appearing in the letter occupied equal importance. Yet, at the meeting of March 19th and according to the commissioner, the issue that occupied most of the time of the participants and which was of greatest concern to the commissioner was the concrete slab issue. Yet that issue was designated in the letter as the 9th item out of ten specifications. But even if DPW's argument is accepted, because of the form in which the March 1st letter was written, one preparing for a hearing based on this letter is likely to squander his time and effort on less important matters at the expense focusing on preparing to meet the primary issue. Had Pace been notified in advance of the meeting that the concrete slab strength was the primary issue, it could have better prepared to meet it. For example, it could have arranged for the concrete supplier to be present at the meeting to orally discuss and respond to questions about the compression test results (some of which favorable to Pace) rather than forwarding a written report to the commissioner subsequent to the meeting. In addition, there is little if any evidence in the record that DPW experts at the meeting challenged Pace's interpretation of the disputed tests. All that is certain is that after the March 19th meeting DPW staff evaluated unspecified technical data and their judgments were accepted by the commissioner without any opportunity for input by Pace.
Many of the violations specified in the March 1st letter CT Page 158 involved matters that called for subjective opinions such as fault for delays and the proper manpower management of the project which were apparently critical to the commissioner's decision to terminate. In addition there were issues dealing with the evaluation of professional judgments regarding the interpretation of the tests and the validity of the testing procedures used. According to the commissioner, many of these issues, especially the ones dealing with the concrete slab, were most critical to his decision to terminate. Considerations of credibility and veracity would naturally play an important role in the determination of these issues inasmuch as professional reputations of those rendering opinions were also at stake. It is obvious from the history of this entire matter that several participants at that meeting had a definite bias against Pace.[19] Where the source of information critical to the decision emanates from people who have a bias toward one side or the other and a distinct interest in the controversy's outcome, the specter of questionable credibility and veracity is ever present. Consequently such matters are more properly the subject of oral as distinguished from written responses Mathews v.Eldridge, supra., 344; Goldberg v. Kelley, supra, 269. Yet Pace was not given the opportunity to orally respond to some of these issues especially after additional evidence was furnished to the commissioner by DPW subsequent to the March 19th meeting.[20]
Under such circumstances all such matters relevant to the decision to terminate should have been subject to oral as distinguished from written responses. See, Mathews v. Eldridge,supra, 344; Goldberg v. Kelley, supra, 269.
Finally, some after acquired data critical to the commissioner's decision to terminate was admittedly erroneous or inaccurate.[21] Pace was never given the opportunity to challenge this evidence either orally or in writing before termination.
These circumstances when considered in light of all of the events surrounding this termination, unmistakably suggest that the risk for an erroneous deprivation was substantial. This risk is unacceptable considering that with the addition of a few simple procedures the process would likely have been immune to attack. For example, had Pace been sent an unambiguous notice of termination containing a list of the charges against it in order of importance, rather than a routine "cure" letter, Pace could have adequately prepared itself for the hearing. Had the commissioner arranged his schedule to accommodate the time CT Page 159 reasonably necessary to discuss all issues allotting time to the various issues in accordance with their importance, the chances of an erroneous decision would have been substantially lessened. Had there been a stenographic or tape recorded record made of all proceedings, there would be certainty as what evidence was presented and the reasons for termination could have been easily supported by that record. And, finally, had the commissioner unambiguously indicated the evidence upon which he relied in his termination letter, much confusion and suspicion over the fairness of the entire process would have been eliminated. In this regard see, Goldberg, supra, 271.
For all of the foregoing reasons this court concludes that the second prong of the test has not been satisfied
The State's Interest and Burdens
From the outset DPW's interest has been to obtain a finished addition to the Memorial Hall project within the agreed contract period and to minimize any necessary delays in accomplishing this goal. It also has a legitimate interest in minimizing taxpayer expense and administrative burdens in resolving serious disputes with the people it contracts with. The sufficiency of the process of addressing the issue of contract termination for cause must in part be dependent on these factors. Mathews v. Eldridge, supra,
347-348. The question then is whether the additional due process safeguards, designed to assure that DPW's action in terminating contracts is just and fair, is outweighed by the cost of providing those safeguards. Mathews v. Eldridge, supra, 348. Financial costs alone is not controlling. The cost of administrative burdens must also be weighed. Id.
In the present case that question just posed should be answered in the negative. This is because with only a relatively modest investment in administrative and financial resources, the existing termination process could be made to pass constitutional muster. Inasmuch as a hearing procedure is already in place, the mere addition of recording equipment to record the hearing; the addition of an adequate written notice of the hearing to the contractor; the setting aside of a reasonable period of time for the presentation of all important issues at the hearing; and, the preparation of an unambiguous termination letter by the commissioner containing the reasons for the termination with the recitation of the evidence supporting those reasons should impose little in expense and administrative burdens upon the State. What CT Page 160 this will accomplish however, is reasonable assurance that contractors doing business with the state who are in jeopardy of being terminated for cause will receive a just resolution of the issues involved.
For all of the aforementioned reasons the court finds that the plaintiff has not been given an opportunity to be heard either in a meaningful manner or at a meaningful time. Consequently, it did not receive the process it was due in the termination of the WESCON contract. The court further concludes that there exists a bona fide and substantial question in dispute which requires settlement between the parties in advance of any determination of issues of fault with respect to the claimed breach of contract. This is a proper predicate for the issuance of a declaratory judgment under section 52-29 CGS. HartfordAccident Indemnity Co. v. Williamson, 153 Conn. 345, 347
(1966). Furthermore, of all the remedies sought by the plaintiff, this remedy seems the most appropriate as it allows the parties the freedom to themselves resolve this dispute within the parameters of the contractual framework in which the dispute began. Within this framework the parties are able to resolve this dispute by selecting one of three options: they may pursue the merits of the dispute by resort to another termination for cause hearing not inconsistent with this decision; the contract may be terminated for convenience of the state and the project completed by another contractor or Pace may be permitted to complete the project under the existing contract. Given the time constraints involved in the completion of this project and the competing interests of all the parties in this matter, including the surety, this remedy appears to impose the least onerous burden upon the state consistent with recognition of the plaintiff's property interests in the continuation of the contract or, at least, in the preservation of its future business prospects.Savage v. Aronson, 213 Conn. 256, 266 (1990); See also, Sentnerv. Board of Trustees, 184 Conn. 339, 344 (1981).
Accordingly, the court hereby DECLARES NULL and VOID the termination of said contract as set forth in commissioner Anson's letter dated April 9, 1996.
BY THE COURT,
MELVILLE, J.