[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANT'S POST-TRIAL MOTIONS
The defendant Stop Shop has filed a series of post-trial motions. A motion for judgment notwithstanding the verdict, a motion to set aside the verdict, a motion for a new trial and a motion for remittitur have been briefed and argued.
The claim tried to the jury on behalf of the three plaintiffs was for negligent infliction of emotional distress. They were all former Stop Shop employees and were arrested subsequent to a Stop Shop investigation the result of which were turned over to the police. After further police investigation in which Stop Shop personnel participated, the plaintiffs were arrested on larceny charges. They were later exonerated in criminal proceedings and they brought suit. The court will discuss each of the legal claims made by the defendant in its post-trial motions.
PURSUANT TO THE GARMON PREEMPTION DOCTRINE OF § 10 NATIONAL LABOR RELATIONS ACT (NLRA), THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THE PLAINTIFFS' CLAIMS BECAUSE THEY ARE BASED ON ALLEGED CONDUCT ARGUABLY PROTECTED OR PROHIBITED BY SECTIONS 7 AND 8 OF THE NLRA.
It is clearly the law that in light of San Diego Bldg. Trades Councilv. Garmon, 359 U.S. 236 (1959) "the jurisdiction of state courts . . . must yield to the exclusive primary competence of the NLRB if the activities sought to be regulated are either arguably protected as "concerted activities' under 29 U.S.C. § 157 or arguably prohibited as unfair labor practices under 29 U.S.C. § 158 . . . The rule is designed to avoid the potential for jurisdictional conflict between state courts . . . and the NLRB by ensuring that primary responsibility for CT Page 1039 interpreting and applying §§ 157 and 158 remains with the NLRA."Muenchow v. Parker Pen Co., 615 F. Sup. 1405, 1411 (D.C. Wis. 1985). Connecticut agrees as it must with this proposition, cf Laverv's MainStreet Grill, Inc. v. Hotel Employees Union, 146 Conn. 93, 100-101
(1959); Barbieri v. United Technologies Corp., 255 Conn. 708, 732 et seq (2001).
As the Barbieri court noted: "Exceptions to the preemption of the state jurisdiction under this rationale do exist, and a state is not ousted of the power to adjudicate matters that are of `peripheral concern' to the federal labor scheme or where the conduct at issue "touches interests' . . . deeply rooted in local feeling and responsibility . . . In assessing whether to apply either exception a court must balance "the state's interest in controlling or remedying the effects of the conduct . . . against both the interference with the National Labor Relation's Board ability to adjudicate controversies committed to it by the act . . . and the risk that the state will sanction conduct that the Act protects."255 Conn. at 734; also see Muenchow v. Parker Pen Co. at 615 F. Sup. 1411.
The defendant argues that the negligent infliction of emotional distress claim of all three defendants should be preempted under Garmon. It is argued that "Discovery exposed the true nature of plaintiffs' claims as unfair labor practices and betrayed their artful pleading of those claims as state common law torts." The court should look beyond these attempts to avoid preemption. The deposition testimony of each plaintiff is cited where they expressed the belief that Stop Shop suspended them and/or referred their names to the police in retaliation for their involvement in a February 1994 meeting where they complained about working conditions to management and a subsequent letter by Tirrell to Stop Shop about that meeting. A paragraph in the negligent infliction of emotional distress count in the September 3, 1998 Revised Amended Complaint of Ms. Tirrell is pointed to by Stop Shop wherein it is specifically alleged that she "was suspended in retaliation for her exercise of her right of free speech as to union matters regarding working conditions . . ." This is said to be a "judicial admission" underDrier v. Upjohn Co., 196 Conn. 242, 248 (1985) which clearly characterizes the negligent infliction of emotional distress claim of all three plaintiffs as the type of claim that is precluded by Garmon.
The court will now analyze the defendant's Garmon argument beginning with the last observation. It is difficult to understand how what is said by one plaintiff can be said to be an admission binding another plaintiff. Furthermore, pleadings can be amended at any time, even after trial. More to the point, the Garmon claim must be analyzed in terms of what evidence was actually presented at trial to support the plaintiffs' CT Page 1040 claims, what was argued to the jury and what the jury was instructed on by the court. The jury was not presented with evidence or argument to the effect that the referral to the police was done in retaliation for the above-referenced February 1994 meeting and letter. What the plaintiffs may have believed in their "heart of hearts" or what was pled in a complaint filed three years before trial cannot affect the preemption question in circumstances where a trial has taken place. In fact, what we have here is the analytical reverse of the situation in Farmer v.Carpenter, 430 U.S. 290 (1977). The analysis of that case in Clayton v.Gold Bond Bldg. Products, 679 F. Sup. 637 (E.D. Mich., 1987) makes clear that to decide the preemption question after trial the evidence presented at trial is what must be examined. Commenting on Farmer, the court said:
 "In Farmer the Supreme Court held that a claim for intentional distress brought under California law against the union for discrimination against a member was not per se preempted by the NLRA. . . . Because the issue of liability could be resolved under California law without consideration of whether unlawful discrimination occurred, the court declined to hold that the tort was preempted as a matter of law . . . Nevertheless, the court concluded that the claim was preempted based on the facts of the case because the evidence actually presented at trial focused primarily on discriminatory hiring hall practices as opposed to the alleged `outrageous conduct.'" (Emphasis by this court.) 679 F. Sup. 640-41.
 This is only a variation of the observation made by the Supreme Court in Sears, Roebuck Co. v. Carpenters, 436 U.S. 180 (1977). It is the evidence actually presented not what could have been presented that is important. Thus, in Carpenters, the court said at pages 197-198 in deciding whether an exemption from Garmon should apply:
"The critical inquiry, therefore, is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to (as in Garner) or different from (as in Farmer) that which could have been, but was not, presented to the Labor Board. For it is only in the CT Page 1041 former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the Garmon doctrine was designed to avoid.
 In the present case, the controversy which Sears might have presented to the Labor Board is not the same as the controversy presented to the state court. If Sears had filed a charge, the federal issue would have been whether the picketing had a recognitional or work-reassignment objective; decision of that issue would have entailed relatively complex factual and legal determinations completely unrelated to the simple question whether a trespass had occurred. Conversely, in the state actions, Sears only challenged the location of the picketing; whether the picketing had an objective proscribed by federal law was irrelevant to the state claim. Accordingly, permitting the state court to adjudicate Sears' trespass claim would create no realistic risk of interference with the Labor Board's primary jurisdiction to enforce the statutory prohibition against unfair labor practices."
For these reasons the court concludes the preemption doctrine of Garmon is not applicable.
But even if the court is incorrect in its foregoing analysis this is a case where an exemption to the Garmon preemption doctrine would apply. This is a case where Stop Shop turned over the result of what was claimed to be an incomplete and poorly conducted investigation to a local police department, relying on the police to protect its interest and participating in the investigation to the extent of having representatives sit in on critical interviews of employees Ives and Correia that were instrumental in leading to the plaintiffs' arrests. The jury had a right to believe that what the defendant knew or should have known of the working condition of the cash office would have cast serious doubt on the statement of Ives working conditions that the police would have no reason to be aware of.
When a law enforcement agency of the state or one of its subdivisions is resorted to in the manner which was done so here it would appear to be CT Page 1042 a matter "deeply rooted in local feeling and responsibility." See quote from Barbieri, supra. In any event, the power to effect an arrest is one of the most important and awesome attributes of government. As said inCarpenters, given the facts here "there existed a significant state interest in protecting the citizen (here the plaintiff) from the challenged conduct." 436 U.S. 196 — assuming of course, the challenged conduct was improper under state law, which is a consideration not involved directly in deciding the jurisdictional issue.
In any event, the court concludes there is no Garmon preemption here.
SECTION 301 OF THE LABOR MANAGEMENT RELATIONS ACT PREEMPTS PLAINTIFFS' CLAIMS BECAUSE THEY REQUIRE ANALYSIS/INTERPRETATION OF THE COLLECTIVE BARGAINING AGREEMENT AS TO THE REASONABLENESS OF DEFENDANT'S ACTIONS IN NOT INTERVIEWING PLAINTIFFS BEFORE REFERRING CASH OFFICE/SERVICE DESK COUPON INFLATION MATTER TO POLICE. ALSO SECTION 301 PREEMPTS PLAINTIFFS' CLAIMS BECAUSE THEY ARE INEXTRICABLY INTERTWINED WITH THE COLLECTIVE BARGAINING AGREEMENT.
Section 301 of the federal Labor Management Relations Act states that: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties. . . ."
In 1957, the Supreme Court held Section 301 gave federal courts jurisdiction over contract controversies involving collective bargaining agreements (cba's). Textile Workers v. Lincoln Mills of Alabama,353 U.S. 448, 451 (1957). In the case of Allis-Chambers Corp. v. Lueck,471 U.S. 202, 210 (1985), the court further held that the preemptive effect of § 301 went beyond contract actions and extended to tort remedies. In that case, the state tort remedy was preempted because the court held that:
"The interests in interpretive uniformity and predictability that require that labor contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit CT Page 1043 alleging liability in tort. Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract." Id., p. 211.
Johnson v. Beatrice Foods Co., 921 F.2d 1015, 1019 (C.A. 10, 1990) notes that Allis-Chalmers emphasizes that in deciding the issue of preemption a court "must focus on whether the tort "confers nonnegotiable state law rights . . . independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract."'471 U.S. 211. In other words, as Allis-Chalmers went on to point out at page 220, state tort remedies are preempted when they are "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract." In conducting this analysis, a trial court not only looks to the explicit words of the labor contract but what may be implied from its terms. As Allis-Chalmers also said "The assumption that the labor contract creates no implied rights is not one that state law may make. Rather it is a question of federal contract interpretation. . . . Id., p. 215.
At pages 219-220, the Allis-Chalmers summed up the policy reasons behind § 301 preemption of state tort remedies:
 "Since nearly any alleged willful breach of contract can be restated as a tort claim for breach of a good-faith obligation under a contract, the arbitrator's role in every case could be bypassed easily if § 301 is not understood to pre-empt such claims. Claims involving vacation or overtime pay, work assignment, unfair discharge — in short, the whole range of disputes traditionally resolved through arbitration could be brought in the first instance in state court by a complaint in tort rather than in contract. A rule that permitted an individual to side-step available grievance procedures would cause arbitration to lose most of its effectiveness . . . as well as eviscerate a central tenet of federal labor-contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance." (Emphasis by this court.)
But invoking federal § 301 preemption will not preclude all state CT Page 1044 tort claims. As Allis-Chalmers also said:
 "Clearly, § 301 does not grant the parties to a collective bargaining agreement the ability to contract for what is illegal under state law. In extending the preemptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with congressional intent under that section to preempt state rules that prescribe conduct, or establish rights and obligations, independent of a labor contract." 471 U.S. 212.
Also as the Fourth Circuit said in McCormick v. ATT Technologies,Inc., 934 F.2d 531, commenting on Lingle v. Norge Division of MagicChef, 486 U.S. 399 (1988).
 "The Lingle Court made clear that mere parallelism between the facts and issues to be addressed under a state law claim and those to be addressed under § 301 does not render the state-law analysis dependent on the collective bargaining agreement. Thus, "even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent' of the agreement for § 301 preemption purposes."' Id., p. 535.[1]
Guided by these general principles the court will attempt to analyze what for it is a very difficult issue — the applicability of § 310 federal preemption to the plaintiffs' state tort claims.
To set the discussion in focus, the court will quote from the charge which defined the plaintiffs' claim for the jury.
 "The plaintiffs claim the defendant was negligent in that it failed to conduct a proper investigation and therefore when they turned the matter over to the police, Stop Shop knew or should have known they had not engaged in the activity they were accused of." (Emphasis by this court.)
The "and therefore" language is important to the analysis. CT Page 1045
In other words, the court made clear to the jury that the gravamen of the claim was not the nature of the investigation, its adequacy, or the fact that it was conducted all standing alone these factors were to be considered in light of the fact that the matter was turned over to the police. In fact, immediately following this language, the court went on to advise the jury under what circumstances a private party could even be held liable in negligence for giving information to the police.
The question remains were the plaintiffs' claims preempted under § 301 of the Labor Management Relations Act?[2]
One way of at least addressing the problem in the first instance is to review the purpose behind § 301 preemption and thereby determine whether preemption here would serve to accomplish any of those purposes.
As said in Allis-Chalmers, absent a vigorous preemption doctrine: "Claims involving vacation or overtime pay, work assignment, unfair discharge — in short the whole range of disputes traditionally resolved through arbitration — could be brought in the first instance in state court by a complaint in tort rather than in contract. A rule that permitted an individual to sidestep available grievance procedures would cause arbitration to lose most of its effectiveness."471 U.S. 219-220. The claim in this case does not involve working conditions — while the investigation was going on two of the plaintiffs were not at the work site and the remaining plaintiff like the other plaintiffs makes no claim that the investigation was conducted in such a way as to make actual working conditions difficult or abusive. Apparently, the arrests themselves came as a surprise and were made after all investigation was completed.
Neither is there a claim made in state court that due to a faulty investigation illegal work discipline was imposed or an illegal termination was brought about. There was and can be no dispute that a company has the right to investigate when there is suspicion of employee theft and Article 16 recognizes that right in saying "The management of the employer's business and the direction of the working forces shall vest solely in the employer within the provisions of the agreement."
In McCormick v. ATT Technologies, Inc. 934 F.2d 531, 535 (C.A. 4, 1991) the court said . . . "the question in § 301 preemption analysis is not whether the source of a cause of action is state law, but whether resolution of the cause of action requires interpretation of a collective bargaining agreement. This approach advances § 301's goal of "ensur(ing) uniform interpretation of collective bargaining agreements CT Page 1046 and thus . . . promoting the peaceable consistent resolution of labor-management disputes.'" (Quoting from Lingle v. Norge Division ofMagic Chef, supra.
The present tort claims do not require interpretation of Article 16, it must be conceded that the defendant had a right to investigate here. Also the quality of that investigation, its thoroughness and fairness was not being questioned in relation to any management decision regarding discipline or discharge. In other words, the template offered to judge or weigh the defendant's investigatory activities was not done in the context of any internal action taken by management against these employees regarding working conditions, discharge or discipline — the test offered was whether the defendant's actions in turning the matter over to the police violated state rights created by its tort law. Also, the Ives statement which the jury could conclude was instrumental in leading to the arrests (common sense would indicate the same) was taken by the police, after any separate investigation by the defendant and one of the conclusions the jury could draw from the evidence is that because they were present at the police interview, Stop Shop personnel knew or should have known that statement bore no factual relationship to actual working conditions in the cash office. How is such behavior cognizable under Article 16 Management perogatives? So what then is the ambit of labor contract interpretation of a provision like Article 16? Should a court have the power under § 301 to interpret it by way of implication as providing that a company can turn over a matter to the police for prosecution of an employee despite having conducted a faulty investigation by the standards of state law and despite remaining involved in the police investigation and becoming aware of police gathered information which is known or should have been known as not worthy of belief? As said in Allis-Chalmers: "Clearly, § 301 does not grant the parties to a collective bargaining agreement the ability to contract for what is illegal under state law. In extending the preemptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with congressional intent to preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." 471 U.S. at 212.
Or to approach the problem from a broader perspective. The general purposes of § 301 preemption must be recalled. Cases earlier referred to said that preemption of state claims is necessary to prevent parties from sidestepping grievance procedures and the remedy by way of arbitration. Query could a labor contract be interpreted as providing that employees have a right to initiate grievance procedure when or because a company decides to turn a matter over to the police for investigation of possible criminal activity by the employee? Perhaps, but CT Page 1047 should it end up in arbitration? Will the arbitrators in each state jurisdiction have to inform themselves of the peculiarities of each jurisdiction's tort law as to when such conduct is not violative of state tort law? Is that the uniform body of federal common law in interpreting § 301 cases like Allis-Chalmers was talking about?
The whole point is that Stop Shop had a perfect general right to turn a matter such as this over to the police but its actions must be judged by the forum in which it chose to operate in a state court applying state tort law. That is, its conduct is to be examined not as to the propriety of the investigation it conducted or even how well it was conducted in terms of its rights, express or implies, under the labor contract but only in terms of the quality of that investigation at the point it was turned over to the law enforcement agency. That determination does not require this court to interpret the collective bargaining agreement but only to determine whether the conduct comports with state law.
An examination of the cases is instructive. It is no doubt true that several cases have held that § 301 preempted state claims for intentional and/or negligent infliction of emotional distress. But it will not do to merely catalogue the cases; they must be examined in terms of the factual settings in which the claims were made. In Willis v.Reynolds Metals Company, 840 F.2d 255 (C.A. 4, 1988), an intentional infliction of emotional distress claim was held to be preempted in a situation where the plaintiff employee alleged she was harassed as a result of the company's investigation into another worker's complaint that her car was damaged by other employees. The court held the case "directly dealt with (the company's) right to conduct investigations into possible harassment of one employee by a co-worker and the associated right to confront the employee." Id., 255, cf Bagby v. General MotorsCorp., 976 F.2d 919, 920, 921 (C.A. 5, 1992). Also see Baker v. FarmersElec. Co. Co-Op, Inc., 34 F.3d 274 (C.A. 5, 1994) where an intentional infliction of emotional distress claim was held preempted. The court said at page 280:
 "Baker does not allege that any action on the part of the defendants other than his reassignment to a maintenance position has caused him mental distress. He alleges no instances of harassment, discrimination, physical abuse or other conduct which would provide grounds for an emotional distress claim.
Baker must prove, as an element of his claim of CT Page 1048 intentional infliction of emotional distress, that the defendant's actions in reassigning him were extreme and outrageous. The terms of the (collective bargaining agreement) are relevant to this issue, because (it) expressly grants management right over the business of Farmers and its employees which could be interpreted to include the right to reassign an employee's duties."
These cases concern the right of management to make work place decisions and to investigate work place disputes and complaints in the context of managing the work place and within the confines of the workplace. That is not the situation now before the court. Other cases dealing with this type of tort involve claims of intentional or negligent infliction of emotional distress associated with discharge from employment. In Neberry v. Pacific Racing Ass'n. , 854 F.2d 1142 (C.A. 9, 1988), such a claim was dismissed where the plaintiff alleged a cursory investigation by management into racetrack operations led it to improperly accuse him of theft and fire him. The court in holding the tort claim was preempted said that "From these allegations it is clear that Newberry's emotional distress claim arises out of her discharge and the defendant's conduct in the investigation leading up to it," thus the court went on to say it would be necessary for it to decide "whether her discharge was justified under the terms of the collective bargaining agreement." Id., 1149.
In Brown v. Southwestern Bell Tel. Co, 901 F.2d 1250, 1255 (C.A. 5 1990), the court held for preemption saying "Although his claim is couched in terms of outrageous conduct and intentional infliction of emotional distress, Brown essentially maintains Southwestern Bell could not terminate him while he was absent from work pursuant to his doctor's orders. That is to say, Brown asserts that such an absence did not constitute a just cause for discharge under the collective bargaining agreement." cf Thomas v. LTV Corp., 39 F.3d 611 (C.A. 5, 1994) negligent and intentional infliction of emotional distress claims dismissed; claim was that the company's handling of disciplinary matters which led to his discharge was wrongful, extreme and outrageous. cf Kellman v. Yale Newhaven Hospital, 64 F. Sup.2d 35 (D. Conn., 1999) (propriety of discharge for physical confrontation with another employee required examination of labor contract to see whether hospital acted within bounds of contract. Intentional infliction of emotional distress claim therefore dismissed.)
Again, a discharge case is not what is involved here in light of the court's previously stated factual analysis of the case. CT Page 1049
An interesting case, though not on all fours with this case, isAlberton's, Inc. v. Carrigan, 982 F.2d 1478 (C.A. 10, 1993) where the court refused to find § 301 preemption of the state law claim in the context of the factual setting of that case. There the court said:
 "In the case before us there is no doubt that many, if not all of the same factual issues and disputes will have to be resolved in arbitrating the discharge under the collective bargaining agreement as in determining the conspiracy or outrageous conduct claim. But it is also true that if plaintiffs can show defendants conspired to have Mrs. Aguire arrested by fabricating her theft of groceries from her employer, proving their outrageous conduct need not require interpretation of or reference to (collective bargaining agreement). . . .
 If we were to hold § 301 preempts plaintiffs state law claim that defendant's conspired to set her up for arrest and imprisonment just because the same factual disputes would be present in arbitration under (the agreement), it would seem impossible to set out a state claim when the complaint also states a federal § 301 claim or a grievance procedure is commenced under the (agreement). Id., 1482-1483.
In the Carrigan case, the plaintiff was suspended from her employment as a result of the shoplifting investigation. And there is of course no claim that Stop Shop fabricated its investigation or any position it took with the police regarding this matter. But the jury was entitled to conclude, for example, that the centrally important Ives's statement made in the presence of an apparently silent management staff, could not be supported by the facts as that staff knew or should have known them, even leaving aside the jury's conclusion regarding the nature of the Stop Shop investigation prior to the matter being turned over to the police. In that sense, the observations of the Carrigan court are of some interest.
In any event, the court cannot find § 301 preemption.[3]
THE PLAINTIFF'S CLAIMS ARE BARRED BY COLLATERAL ESTOPPEL AND RES JUDICATA BECAUSE OF JUDGEMENT AND RULINGS ON MOTIONS FOR SUMMARY JUDGMENT CT Page 1050 IN FEDERAL DISTRICT COURT.
The defendant's position is fairly presented by the statements in its brief and its reference to Connecticut state law defining the doctrines of res judicata and collateral estoppel. Referring to actions filed in federal court, the defendant makes the following observations in its brief:
 "In Fleming and Bimler, the federal court held that the Union had not breached its duty of fair representation under federal labor law. Thus, the federal court held that Fleming and Bimler were not excused from exhausting the grievance/arbitration procedures set forth in the CBA. From this holding, it follows that Plaintiffs are barred from seeking damages against Stop Shop for alleged wrongs which could have been redressed through the CBA's grievance/arbitration procedure (E.G., control of working conditions, suspension, reinstatement, etc.). Similarly, in Tirrell, the federal court held that she failed to exhaust her contractual remedies under the CBA by delaying too long before pursuing her rights under the agreement. A review of the pleadings filed in these cases demonstrate that Plaintiffs failed to exhaust their contractual under the CBA for alleged conduct which could have been redressed." (CBA is the collective bargaining agreement.)
The defendant argues that because of all this the present damage claim regarding the defendant's conduct in connection with the time card suspensions and cash office investigation are barred. These and other issues complained about could have been addressed through the grievance/arbitration procedure of the collective bargaining agreement. The defendant then goes on to quote from Mazzotti v. Allstate Ins. Co.,240 Conn. 799, 812 which sets forth the scope of the doctrine it relies on:
""Res judicata, or claim preclusion, is distinguishable from collateral estoppel, or issue preclusion. Under the doctrine of res judicata, a final judgment, when rendered on the merits, is an absolute bar to a subsequent action between the same parties or those in privity with them upon the same claim. [Citations omitted.] In contrast, collateral estoppel precludes a party from re[-]litigating issues and facts actually and necessarily determined in an earlier CT Page 1051 proceeding between the same parties or those in privity with them upon a different claim. [Citations omitted.]' Furthermore, "to invoke collateral estoppel the issues sought to be litigated in the new proceeding must be identical to those considered in the prior proceeding. [Citations omitted].' Both issue and claim preclusion "express no more than the fundamental principle that once a matter has been fully and fairly litigated, and finally decided, it comes to rest.' [Citations omitted.]"
Here, Stop Shop argues "the plaintiffs and the Union `actually litigated' the issue of plaintiffs' failure to exhaust their rights under the (collective bargaining agreement) which issue the federal court `necessarily determined' to reach its final judgment" in granting the Union's summary judgment motion.
Finally, the defendant sets forth the "policy reasons for barring claims for alleged wrongs, which could have been redressed through a contractual grievance/arbitration procedure." In Labbe v. PensionCommission, 229 Conn. 801, 811-12 (1994) the court said:
 "The purpose of the exhaustion requirement is to encourage the use of grievance procedures, rather than the courts for settling disputes. A contrary rule, which would permit an individual employee to completely sidestep available grievance procedures in favor of a lawsuit, has little to commend it. . . . It would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances. If a grievance procedure cannot be made exclusive, it loses much of its desirability as a method of settlement. A rule creating such a situation would inevitably exert a disruptive influence upon the negotiation and administration of collective [bargaining] agreements."
The court will now try to examine the defendant's claim under the doctrines of collateral estoppel and res judicata.
An examination of Judge Nevas's decision in District Court granting the Union's motion for summary judgment indicate that the doctrines do not apply. Is the claim the same in federal court (res judicata)? Are the issues and facts that could have been litigated in that action necessarily the same as those which were litigated in this state action (collateral estoppel)? The answer to both questions would appear to be CT Page 1052 no. Fleming and Bimler were arrested. They informed the union of their acquittals and as Judge Nevas notes "requested, pursuant to the collective bargaining agreement, that the Union pursue their grievances in relation to their suspensions from Stop Shop." A so-called Third Step grievance meeting was arranged for October 20, 1995 but Judge Nevas notes the plaintiffs refused to attend it because they did not feel comfortable with the particular union official who was to represent them. Because of their refusal to attend the meeting, the defendant refused to reinstate them. The union official indicated arbitration was the next step. However, Fleming and Bimler made it known that they had no confidence in the particular union representative or in the union itself and proceeded to bring suit in federal court. Based on these facts, Judge Nevas dismissed the failure to provide fair representation claim against the union and in granting summary judgment reasoned that "summary judgment must enter in the union's favor because Fleming and Bimler failed to exhaust the available remedies under the collective bargaining agreement." The federal court ruled also that Mrs. Tirrell's claims were time barred because she delayed too long before pursing her rights under the agreement.
The issue of fair representation in the action against the union in federal court would not have necessarily litigated the issue presented by this state action which is based on the emotional distress claimed to have been caused to the plaintiffs by the allegedly inadequate investigation of cash office derelictions by Stop shop, its involvement in the police investigation, all of which led to the arrests which were the cause of the harm.
After the fact, complaints about the union's unfair representation regarding suspension even if due to or extended by the criminal investigation resulting in charges are not necessarily tied to the state claims. In Vaca v. Sipes, 386 U.S. 171 (1967), the court said: "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." Id., 190. Would any claim based on failure to provide fair representation necessarily have to reach the merits of any grievance if the union was otherwise able to show it provided fair representation?
Apart from the foregoing reasoning there is another consideration which makes the court reluctant to rely on a failure to exhaust remedies argument as a platform on which to base a collateral estoppel and res judicata argument — in fact, failure to exhaust such remedies is the predicate for the whole argument. The defendant says "Moreover, Plaintiffs had adequate remedies available to them under the (collective CT Page 1053 bargaining agreement) if they had exhausted their rights under it, which bars all of Plaintiffs' claims against Stop Shop." In the case ofHunt v. Prior, 236 Conn. 421 (1996), the plaintiff argued he did not have to exhaust administrative remedies because they would have been inadequate. Id., 432, cf O G Industries, Inc. v. Planning Zoning Commission, 232 Conn. 419, 429 (1995). The Hunt court rejects this argument and as quoted by the defendant says the following:
 "We may assume that (the plaintiff) is correct in asserting that the grievance provisions of the collective bargaining agreement do not allow for an award of punitive damages, attorneys' fees or costs, relief to which plaintiff might have been entitled upon proof of "willful, wanton, capricious and illegal' conduct by defendants. [footnote omitted]. Nevertheless, we are not persuaded that the plaintiffs administrative remedies were inadequate. Had the plaintiff availed himself of his grievance rights under the collective bargaining agreement, he would have received "immediate consideration and review of the very issue of wrongful [suspension] that the plaintiff raises in this action.' [citation omitted] . . . "It is not the plaintiffs preference for a particular remedy that determines whether the remedy is adequate [citations omitted]. Moreover, once the plaintiff had exhausted his administrative remedies, he could then have sought redress in the court. [footnote omitted]."
The Hunt case cited La Croix v. Board of Education, 199 Conn. 70 (1986) which in deciding that failure to exhaust administrative remedies barred the action before it said: "General Statutes § 10-51 (b) guarantees a tenured teacher the right to a hearing prior to termination in which the teacher can challenge the proposed board action and § 10-51 (f) provides the right to a direct appeal from an unfavorable decision after the hearing." That is not what we have here. here the claim being advanced is for emotional distress caused by arrests after what was claimed to be an inadequate investigation of criminal activity which was then turned over to the police. An administrative remedy that could have been pursued to contest job termination, or working conditions has nothing to do with the alleged harm claimed in the state action so it is difficult to see how any state action advancing the claims it did would be barred on exhaustion grounds.
PLAINTIFFS CANNOT RECOVER ON THE NEGLIGENT INFLICTION OF EMOTIONAL CT Page 1054 DISTRESS CLAIM BECAUSE THE COMPLAINED OF CONDUCT OCCURRED DURING THEIR EMPLOYMENT AND NOT DURING THE TERMINATION PROCESS.
This issue requires an examination of Perodeau v. Hartford, 259 Conn. 729
(2002) for what it holds and for what it does not explicitly say or decide. That case dealt with the negligent infliction of emotional distress claim of a municipal employee but its reasoning applies to all such claims by working people against fellow employees or their employer; see discussion of Morris v. Hartford Courant Co., 200 Conn. 676
(1986) and Parsons v. United Technologies Corp., 243 Conn. 66 (1997) at 259 Conn. 749-51. The claim against the employer city in Perodeau was dismissed in federal district court apparently for failing to meet the requirements of § 1983 for suits against municipal entities. Id., p. 259 Conn. p. 733.
Under the reasoning of Perodeau, suits against employers will not lie for negligent infliction of emotional distress "arising out of conduct occurring within a continuing employment context, as distinguished from conduct occurring in the termination of employment." Id., pp. 762-63. What is the ambit of the phrase "conduct occurring in the termination of employment?" The court at points in the opinion seems to use the word "termination of employment" interchangeably with the broader notion of the "termination process" — see discussion of Morris id., p. 750 and of Parsons id., p. 751. In other words, it must be kept in mind that there is another side of the coin to Perodeau — certainly under that case a claim for negligent infliction of emotional distress where it arises out of conduct occurring within a continuing employment context is not viable but an action will lie where the emotional distress claim arises in the context of employment termination. Thus it is necessary to define what is meant by termination as opposed to the continuing employment concept. If Perodeau meant to confine termination to the simple act of firing someone under humiliating circumstances where the firing occurs at a defined date and time why use the words "terminationprocess" and why not say no such suits would be allowed in the employment context "prior to termination as opposed to the language used no such suits based on conduct occurring within a continuing employment context" (emphasis by this court)?
For the definition of termination process we must look at the reasons the Perodeau court gave for ruling that an action for negligent infliction of emotional distress would not lie for conduct occurring in a continuing employment context. That reasoning is set forth at 259 Conn. 258; two reasons were given:
"First in an ongoing employment relationship, CT Page 1055 employees who fear lawsuits by fellow employees may be less competitive with each other, may promote the interests of their employer less vigorously, may refrain from reporting the improper or even illegal conduct of fellow employees, may be less frank in performance evaluations, and may make employment decisions such as demotions, promotions and transfers on the basis of fear of suit rather than business needs and desires. All of this conduct would contribute to a less vigorous and less productive workplace. We conclude that such a pervasive chilling effect outweighs the safety interest of employees in being protected from negligent infliction of emotional distress. In cases involving a termination of employment, on the other hand, the employee can no longer use the threat of a lawsuit to influence the conduct of his employer and fellow employees.
 Second, in light of the inherently competitive and stressful nature of the workplace and the difficulties surrounding proof of emotional distress, extending the tort of negligent infliction of emotional distress to ongoing employment relationships would open the door to spurious claims."
In deciding what is the continuing employment context as opposed to termination or the termination process (the whole universe in these matters) one must keep these principles in mind when examining the facts that a particular case presents.
In this case, the plaintiffs were formally terminated from employment shortly after October 20, 1995. They had requested that the union undertake grievance procedures pursuant to the union contract but were terminated after a meeting with Stop Shop when they refused certain terms offered by the company.
But the plaintiffs Fleming and Tirrell had no ongoing employment relationships since March 5, 1994 when they were placed on indefinite suspension because of time card violations and Bimler was suspended May 26, 1994 following the arrest of her and the other plaintiffs. Interestingly, a Stop Shop documents with the heading "Terminations" list these dates as termination dates for all three women. The reason for the terminations was "violation of policy" which CT Page 1056 must have referred to the larceny matter since Bimler was never suspended for time card violations but the same reason — "violation of policy" — was given for her "termination" as for the terminations of the other two plaintiffs. Also a Field Manager for Stop Shop, E. McGrath, prepared a loss prevention report about the larceny investigation dated April 18, 1994. It catalogues the investigation to date and notes that the police detective handling the matter told McGrath warrants had been delivered to the prosecutor's office on April 14, 1994. McGrath and other Stop Shop personnel had first met with the detective on March 25, 1994. On the bottom of this report it says in bold type that it was recommended that "this case remain open pending police follow up and subsequent court proceedings" — i.e. criminal prosecution.
It would seem that the termination process as to these three women can be said to have begun at least when the defendant's employees turned the matter over to the police on March 25, 1994. Fleming and Tirrell were out of the workplace on March 5, 1994, before the Stop Shop investigation even commenced. As to them, it could hardly be said that their presence had any chilling effect on workplace relationships or the scope of any investigation conducted by Stop Shop prior to contacting police.
More to the point perhaps, the critical statements of Ives and Correia which led to the arrests here were given with Stop Shop personnel present and were conducted with the police present. It is quite a stretch to say that employers contacted by the police would be less cooperative in implicating indefinitely suspended employees as opposed to terminated employees. Where concerted activity is allegedly involved can it really be said that the contacted employee would be less cooperative with the police when only one of the purported wrongdoers remains employed and on the job? On the other hand, the incentive to cooperate with the police might be greater than the incentive to talk to a company investigator especially. where failure to cooperate might run the risk of focusing suspicion on oneself. On the other hand, turning the investigation over to the police may lead employees to be less forthcoming because of fear of implicating themselves. Either way, and it is hard to predict the ensuing scenarios; the first reason given by Perodeau for its holding is much less applicable to a situation where the employer contacts the police and an arrest follows — those very events belie any characterization of the relationship between the parties as an ongoing employment relationship. Not only is termination in the offing but the workplace dynamics arguing against imposing employer liability do not seem operative. CT Page 1057
The second reason given — that spurious lawsuits would be less likely to result if this cause of action were barred in the continuing employment context, also underlines the propriety of characterizing what happened here as part of a termination process. A process that would have been completed if the women were convicted or at least would have supported any termination decision. The court talked about "the inherently competitive and stressful nature of the workplace and the difficulties surrounding proof of emotional stress." Page 758. This, the court feared, would open the way to spurious claims. Here the Stop Shop management turned the matter over to the police and that led to plaintiffs' eventual arrest with all the resulting embarrassment that would result from such an event for the average person. People do not "fake" the humiliation they suffer under such circumstances.
THE VERDICT MUST BE SET ASIDE BECAUSE THE DEFENDANT (1) OWED NO DUTY TO THE PLAINTIFFS IN CONNECTION WITH THE INVESTIGATIONS IT UNDERTOOK AND IN TURNING THE MATTER OVER TO THE POLICE; (2) IN TURNING THE MATTER OVER TO THE POLICE IT ACTED WITH A SINCERE AND HONEST BELIEF; (3) STOP SHOP'S ACTIONS WERE PRIVILEGES AND NO REASONABLE JUROR COULD CONCLUDE OTHERWISE; (4) THE INSTRUCTIONS ON THE LAW WERE INCORRECT AND EVEN UNDER THE INSTRUCTIONS NO REASONABLE JUROR COULD HAVE FOUND IN THE PLAINTIFFS' FAVOR.
The defendant has presented broad based attack on the verdict, the law applied to the case and the jury's application of the law. In certain respects the various claims made by the defendant are interrelated. The court will deal with each of the defendant's claims in order.
 (a)
The action here was basically one lying in negligence with the negligence allegedly resulting in emotional distress and with a damage claim asking for damages caused by such distress. Montinieri v. SouthernNew England Telephone Co., 175 Conn. 337 (1978) recognized an action for negligent infliction of emotional distress or to put it another way "there may be liability for unintentionally engaging in conduct that involves an unreasonable risk of causing emotional distress."Connecticut Law of Torts, Wright, Fitzgerald, Ankerman, § 173, p. 518. What Montinieri did make clear was that recovery did not depend on proof of a resulting physical injury or of a risk of harm from a physical impact. Montinieri, of course, did not categorize or classify the type of negligent activity which would permit a claim under the theory it was recognizing.
Also, there were precursors to Montinieri and a case very interesting CT Page 1058 in light of the allegations made here is the case of Collins v. CityNational Bank Trust Co., 131 Conn. 167 (1944). That case was based on a negligence theory of liability. The case basically held that the defendant bank was "liable to its depositor in damages for (the depositor's) arrest and imprisonment on a charge of obtaining money under false pretenses, when it has erroneously and negligently returned (the depositor's) check to the bank which cashed it in the first instance with the notation `no account.'" Interestingly, the court also noted the following facts: "Overnight the police learned the check was good and the plaintiff was found not guilty in the trial justice court and released." Id., pp. 169-70. It should further be noted that despite the fact that Collins predated Montinieri by almost thirty five years, the damage claim and award sounds suspiciously like emotional distress. The court noted the plaintiff had lived in Danbury all his life, ran a business there, had many acquaintances and a good reputation. He learned the police were looking for him, a customer of his queried whether he was putting out "bum checks." The arresting officer threatened to punch him when he protested the arrest, he was put in a cell; the police took away his suspenders no less and fingerprinted him. All in all, "he was very much upset, was obliged to appear in court the next day and was found not guilty." The court said, in passing on the amount of the jury verdict, "these were proper factors to consider." Id., pp. 173-74. The court went on to note that trial court directed the jury to find no special damages but if liability was found to award compensatory damages. Prior to the statutory changes of the 1980's at common law, "such things as loss of earnings, doctors' and hospital bills (were) referred to as special damages." Varley v. Motyl, 139 Conn. 128, 134 (1952). General damages would include compensation for pain and suffering. Kiniry v. DanburyHospital, 183 Conn. 448, 460 (1981). Thus, economic damages are akin to special damages while non-economic damages are akin to general damages which could include a claim for emotional pain and suffering. See Devitov. Schwartz, 66 Conn. App. 228, 234 (2001).
Several things follow from Collins that have a bearing on this case. For one thing, although the criminal proceedings terminated in the plaintiffs favor in that case, a malicious prosecution claim was not made but a claim lying in negligence. The eventual not guilty outcome in was not even part of the Collins analysis since it can be assumed if a party is negligent in initiating an arrest it presupposes there was no probable cause for it and, therefore, the proceeding will one way or another end up in a dismissal for the arrested party. Malicious prosecution was not pursued in Collins because in all likelihood the malice component could not be established; in Mulligan v. Rioux, 229 Conn. 716 (1994), the court said: "In a malicious prosecution action, "the defendant is said to have acted with `malice' if he (or she) acted primarily for an improper CT Page 1059 purpose; that is, "for a purpose other than securing the proper adjudication of the claim on which (the proceedings) are based."' Id., p. 732. In this case also no ulterior or improper motive for the investigation and arrest was advanced at trial; it was a simple negligence claim in Collins where the plaintiff, like the plaintiffs here, was found not guilty. The The point of all this is that if Collins
is examined closely, its explicit holding and what can be implied from that holding puts to rest any concerns the defendant has raised about the supposed analytical conundrum that would be raised by allowing a negligence action in a case like this in light of the parallel existence of a malicious prosecution tort.
 (b)
But the defendant seeks to remove Collins from consideration by arguing, interestingly, that "the only time the Connecticut Supreme Court has found that a private citizen, acting on a sincere and honest belief, owes a duty to a person whom it reports to the police as having engaged in potentially criminal conduct, is in the situation where the parties have some relationship which independently imposes a duty of care on the person reporting the conduct (the court) found a duty existed only because of the bank-depositor relationship which existed."
But that is too narrow a view of duty and duty creation. The court will again quote hornbook law where Wright says: "The Connecticut Court has defined negligence as the breach of a duty. The duty may arise from a contract or be imposed by statute, or a duty of care may arise when theactivities of two persons come so in conjunction that one's lack of careis likely to cause injury to the other." Section 29 at p. 45 (emphasis added). Leaving aside duties created by statute or contract, this formulation does not offer much guidance in particular negligence cases as to whether a duty should be found at common law. Prosser on torts, 5,th Ed. gives some guidance as to the problem and how it can be approached in § 53 at pp. 358-59.
 "But it should be recognized that `duty' is not sacro-sanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection."
"No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists." In other words, the problem of duty . . CT Page 1060 . is a shorthand statement of a conclusion, rather than an aid to analysis in itself."
The question before this court as to whether there was a duty was in part addressed in LaFontaine v. FamilyDrug Stores, 33 Conn. Sup. 66 (1976). In that case, the court discussed whether a common law duty to act with reasonable care could be imposed on a citizen when the citizen turns over information to the police which leads to an arrest. The LaFontaine case believes such a duty exists where the citizen "insists upon, demands or pressures the police to make an arrest." Id., p. 75. This court accepted this position and included language to this effect in its charge. But it added that a duty triggering a negligence analysis would arise where the citizen "takes such a large and affirmative part in the investigation that its own desire to have criminal proceedings initiated was the determining factor in the police officer's determination to seek an arrest warrant application." Here, the evidence indicated the police proceeded in their investigation by relying almost exclusively on the information submitted to them by Stop Shop. The defendant's suspicions, which it felt were raised by its investigation, involved looking into detailed aspects of its business; discounting any suspicions would have required an analysis of business trends in this and other stores and other factors that would affect cash office activities that could only be known or garnered by and by Stop Shop personnel. Here, then, as in Collins, the jury could have found that the information relied upon by the police was supplied in toto by the complainant — there a bank, here the plaintiffs' employer Stop Shop. But the analysis of whether a duty could be found which would allow a Collins analysis does not stop there. Here, after turning its information over to the police, Stop Shop remained involved in investigation. Quite unusually its personnel were present at the interviews of two employees, Ives and Correia, whose statements were critical factors in leading to the plaintiffs' arrests. More to the point, when these interviews occurred these Stop Shop people were aware of information about the operation of the cash office that might have cast doubt on the plausibility of the Ives' statement. This information would not be known CT Page 1061 to the police and practically would have been difficult and time consuming for them to acquire if they had to gather it themselves. Also while all of Stop Shop's investigation and ensuing police activity was going on, no one of these entities talked to the plaintiffs. Stop Shop argues that it could not have talked to the plaintiffs because of the provisions of the labor agreement and because the police would not have wanted them to for fear of compromising the police investigation. The latter is an odd observation in light of the fact that the police relied almost completely on the Stop Shop investigation and when they did do something on their own — interview Ives and Correia — Stop Shop personnel were present. But all of this misses the basic point which is to decide whether the defendant owed a duty to these plaintiffs. Assuming Stop Shop was completely justified in not talking to these women that only underlines the fact that a duty should be imposed on it since absent the important information that might have been garnered from the plaintiffs, Stop Shop had an obligation to make sure that, despite this, the investigation conducted was fair, thorough and balanced. Given the foregoing, the court concludes, to paraphrase Prosser, reasonable people would recognize such a duty and agree that it exists. The instructions given by the court, in its opinion fairly defines the duty and if closely read, is restrictive enough so as to forestall that flood of litigation so feared when tort law is applied in new contexts. Liability would be imposed only where the erring citizen insists or pressures for an arrest or where the circumstances are such that the private investigation subsumes the police involvement. Will the flood gates be opened? — (1) Hardly, when one considered that, applying its test, the LaFontaine court concluded on the facts before it no duty should be imposed on the citizen who made the complaint in that case; (2) also not likely when, taking a broad view, the limitations put on the duty by theLaFontaine court and this court are stricter than anything articulated in Collins.
 (c)
Stop Shop also argues that even under the CT Page 1062 instructions given no reasonable juror could have found in the plaintiffs' favor. The defendant ably marshals the facts to support this position and the plaintiffs in their brief just as ably recite the facts which would lead to an opposite conclusion. To the court, this just emphasizes that this question was one for the jury to decide. There is one aspect to the case that at least the court finds interesting. Someone did eventually admit stealing so query whether the defendant's suspicions about something criminal going on were completely unfounded? But the point is that a jury could conclude that, insofar as the investigation focused on these plaintiffs, both before and after the matter was turned over to the police, the defendant's investigation and the police investigation, which the defendant remained involved in, was flawed given all the reasons Stop Shop knew or should have known as to why these women were not criminally responsible for any losses because of conditions in the cash office where they worked.
 (d)
Stop Shop also claims its internal investigation was privileged as well as its reporting of the matter to the police.
As to the internal investigation a trial court opinion is cited which cites Torosyan v. Boehringer IngelheimPharmaceuticals, Inc., 1 Conn. (1995). The court there held that "in a defamation action communications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege. Such communications and documents are necessary to effectuate the interests of the employer in efficiently managing its business." Id., p. 29. In that case, the privilege was found to have been abused because the defamatory statements about the plaintiff had been made with actual malice — that is with knowledge of their falsity or reckless disregard for their truth. Id., p. 29. This is not, obviously, a defamation action. No issue has been or could be raised about Stop Shop's right to conduct an internal investigation. Certainly, a citizen has a conditional privilege to inform the police of possible criminal CT Page 1063 activity. The point is here that the investigation results were turned over to the police and Stop Shop remained deeply involved in that investigation. Interestingly, the defendant also cites Zenik v.O'Brien, 137 Conn. 592 (1951) a malicious prosecution action referring as did LaFontaine to comment g of § 653 of the Restatement. There, the court held where a citizen instigates a prosecution the principle of citizen immunity in these cases does not apply. Then according to Zenik, the issue becomes whether the citizen had "reasonable ground for instituting the criminal proceeding." Id., p. 597. No mention of a recklessness standard there and compare this to Collinsv. City National Bank, supra, where the same negligence standard is used when negligence by an entity owing a duty to a customer leads to the customer's arrest and where malicious prosecution is not the tort but negligence.
In fact, the court's charge here recognized the citizen privilege and indicated it could be vitiated only in limited circumstances and in fact placed the burden on the plaintiffs to show those circumstances existed.
The court will not grant the motions based on this claim.[4]
THE NEGLIGENCE THEORY ADVANCED AT TRIAL ON WHICH THE JURY WAS INSTRUCTED CONSTITUTED UNFAIR SURPRISE. THE THEORY OF LIABILITY WAS DISCLOSED ONLY AFTER TRIAL BEGAN.
It is difficult to understand how it can be said that prior to trial the defendant was not made aware that the plaintiffs were each advancing a "true negligence case" based on "a new theory of liability under their "negligent investigation' claims; almost four years before trial, the plaintiffs each filed a revised amended complaint containing the following allegations in the Negligent Infliction of Emotional Distress count against the defendant.
f. it failed to conduct a proper investigation into the alleged larceny against the plaintiff. CT Page 1064
 g. it failed to provide the plaintiff, an employee of over 14 years, with no prior criminal record or breach of company policy, with an opportunity to defend herself against these accusations of criminal wrongdoing prior to speaking to criminal authorities.
 h. it accused the plaintiff of criminal wrongdoing when they knew or should have known that she had not done so.
Also, as the plaintiffs point out in their May, 2002 response to the defendant's motion for summary judgment the negligence theory was clearly set forth. In their brief, filed over two months before trial, it was said:
 "In this case, the plaintiff has alleged that Stop Shop through its negligent and unreasonable investigation into alleged improper activities at the customer service desk involving customer service desk coupons have caused the plaintiff to suffer emotional distress and invasion of privacy."
The defendant does also state in regard to this claim that: "Prior to trial, plaintiffs never alleged nor argued that Stop Shop had prevailed upon the Norwich police to such an extent that the police did not exercise their independent discretion in its decision to seek arrest warrants against the plaintiffs." But this aspect of a so-called negligent investigation claim is really a limitation on the right to bring such a claim because generally speaking a citizen cannot be liable for a negligent investigation leading to a complaint to the police and an arrest therefore it is a plaintiffs task at trial to negate the limitation. Under these circumstances, it is more difficult to see how failure to specifically allege this aspect of such a claim prejudiced the defendant.
In fact, besides making the general claim, the defendant does not specifically set forth how they were prejudiced in addressing this aspect of the plaintiffs' claim. The investigating officer testified and was examined by both sides quite thoroughly on the control of the criminal investigation issue. As the court remembers only one officer would have been involved on this issue and the testimony in this area did not concern complicated or obscure factual material. There was no request for a trial delay or opportunity to depose the officer or any other witness CT Page 1065 during the trial.
Given these circumstances, even if the plaintiffs' respective complaints should have contained an allegation to the effect that the defendant's contact with the police really supplied the initiative for police action including the arrest, under the circumstances here it cannot be said that failure to specifically allege this matter gave the plaintiffs an unfair advantage or prejudiced the defendant's in responding to such a claim. It must be noted that this is a state so liberal in allowing amendments to conform to the proof that they have been permitted even after a case has gone to judgment. Ideal Financing Association v.LaBonte, 120 Conn. 190 (1935). The court does not accept the argument made by the defendant as a reason for setting aside the verdict.
SUBSEQUENT INVESTIGATION BY POLICE DEPARTMENT INCLUDING CONFESSIONS FROM IVES AND CORREIA CONSTITUTED SUPERSEDING OF INTERVENING CAUSES THUS PRECLUDING FINDING THAT STOP SHOP WAS LEGAL CAUSE OF PLAINTIFFS' INJURIES.
The defendant argues that the police only sought warrants for the plaintiffs after Ms. Ives provided her statement about the plaintiffs' knowledge and participation in falsely inflating service desk coupons to cover cash shortages created by Correia's theft and Correia's admission to theft. Thus Ives and Correia through their statements were intervening or superseding causes which were the substantial factors leading to the arrests of the plaintiffs.
Quoting from an earlier case, the Supreme Court in Doe v. Manheimer,212 Conn. 748, 759 (1989) set forth the basic law on this subject when it said:
 "We have consistently adhered to the standard of 2 Restatement (Second) Torts, § 442 B (1965) that a negligent defendant whose conduct creates or increases the risk of a particular harm and is a substantial factor in causing that harm, is not relieved from liability by the intervention of another person except where the harm is intentionally caused by the third person and is not within the scope of the risk created by the defendant's conduct."
The basis of the plaintiffs' negligence claim against the defendant was that it conducted an inadequate and incomplete investigation and did not take account of various factors which should have lead it to conclude, as CT Page 1066 a reasonable company, that these women were not responsible for criminal wrongdoing and specifically with trying to cover up the thefts of Correia.
Ms. Ives gave a statement to the police to the effect that the plaintiffs suspected Correia of stealing and they had confronted her and told her the stealing had to stop, all the while covering up for the shortages created by Correia's theft. But much testimony and evidence was presented by the plaintiffs which the jury had a right to believe that the statement of Ives made little sense in light of working conditions — help was pulled from the cash office to help bag at the registers. As said in the plaintiffs' brief . . . "it was impossible for the plaintiffs to ascertain which employee (was) responsible if a cash drawer in the office was short as they were all working out of the same drawer. Their usual practice of balancing these drawers at the end of every shift was not being done because they did not have the time. Therefore, all of the day and night shift employees were working out of the same drawer and it would be balanced at night by the night shift employees, one of which was Donna Correia. They, therefore, did not suspect anyone of stealing and they concluded that any shortages were mistakes being made due to the working conditions."
The jury could have agreed with this rendition of events and if they did, it was clear that this information about working conditions was known or should have been known to Stop Shop and despite this and despite being present at Ives's interview with the police the plausibility of her statement in light of this information was never discussed with the interviewing detective or at least there was no evidence to this effect. Thus the negligent actions and investigation of the defendant, based on factual premises which the jury could have found, was a substantial factor in the resulting harm to the plaintiffs. or to put it more exactly in the context of the issue now before the court, the harm caused to these plaintiffs — their arrest based in large measure on Ives statement — was within the scope of the risk created by the defendant's negligence in failing to properly investigate and take into account working conditions created by the defendant itself and communicate this information to the police. The predicate negligence subject to a scope of the risk analysis lies not only in examining the ambit of affirmative acts of negligence but also the effect of negligence based on a failure to act or take certain steps which result in the substantial possibility of harm.
REQUEST FOR A REMITTITUR OR A NEW TRIAL ON GROUNDS THAT DAMAGE AWARD WAS EXCESSIVE AND SPECULATIVE AND ALSO BASED ON CUMULATIVE EFFECT OF IMPROPER CONDUCT AT TRIAL AND IMPROPER ARGUMENT. CT Page 1067
 (1)
The defendant argues that the verdict should be reduced or a new trial granted because the damage award for each of the plaintiffs was excessive. A leading case on the propriety of a remittitur is Buckman v.People's Express, 205 Conn. 166 (1987). There, the court said:
 "The issue is not whether this court would have awarded more or less. It is whether the total amount of the verdict falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to offend the sense of justice and compel a conclusion that the jury (was) influenced by partiality, prejudice, or mistake." Id., p. 175.
The award made here was $200,000 for noneconomic damages. One of the plaintiffs worked for the defendant for 14 years, another 23 years and Mrs. Fleming for 28 years. As a result of what was alleged to have occurred, all three woman were arrested and subjected to criminal proceedings. They each said they were embarrassed and humiliated by the process. Mrs. Fleming was actually tried. her husband indicated she has not been the same person since this incident; she has become reclusive and does not as readily come in contact with family and friends.
Mrs. Bimler said she felt embarrassed and degraded during the criminal process and her trial. She still worries about how friends and family view her. She has trouble meeting people and those who were her friends. Her husband also testified about the deleterious effect the arrest had on her. The police came to arrest Mrs. Tirrell at her home where among others present were her daughter and grandchildren. Mrs. Tirrell testified that she had to turn herself in at the police station in a wheelchair. The events surrounding the criminal proceeding still cause her stress and she still wonders if people think she is guilty. Her husband also testified that these matters had a great effect on Mrs. Tirrell which continue to this day.
The defendant notes that none of these woman sought professional help or counseling for their alleged emotional problems. It is argued that they "failed to introduce evidence which demonstrated a reasonable probability that they would suffer emotional distress in the future. . . . Here, there was virtually no evidence that plaintiffs probably would suffer injuries into the future. Instead, life expectancy tables were introduced and it was simply argued that the emotional distress could continue into the future. The damages awarded were based on sheer CT Page 1068 speculation and damages were not reduced to their present value because the plaintiffs have not yet suffered the loss for which they are receiving compensation."
This argument, if carried to its logical end, would entirely defeat the right to make a claim for noneconomic damages such as pain and suffering which includes such things as mental and emotional suffering and humiliation caused by the acts of a defendant already found to have been wrongful. There is no requirement that to make such a claim, the emotional injury must be of the type that requires counseling for psychological disorders such as clinical depression, post traumatic stress disorder or clinically identified stress phobias.
First, it should be noted that proof of the existence of emotional distress does not require expert testimony, it can be based solely on the testimony of a plaintiff. See Oakes v. New England Dairies, 219 Conn. 1,14 (1991) where the court also said "Similarly, an award may be valid even though it is not substantially based on incurred medical expenses." Id., p. 15. In Poulin v. Yasser, 64 Conn. App. 730, 747 (2001), the court noted it is not necessary to produce expert testimony to prove medical damages for future pain and suffering or to establish permanency of injury. Royston v. Factor, 1 Conn. App. 576, 577 (1984) established the latter proposition. In that case, there was a claim for a permanent physical injury; the court said if a disability still existed two years after an accident the court could properly conclude it will probably continue. The same reasoning would apply to emotional injury and humiliation, there being no logical reason for a distinction on this score between physical and mental injury. In this case, the arrests of these women took place in the spring of 1994 yet there was testimony from the plaintiffs and their spouses that they suffered emotional and mental distress to the date of their trial testimony in the summer of 2002. If the jury chose to believe this testimony they could properly conclude that the distress would be experienced throughout their lives. It should also be noted that the defendant took no exception to the court's charge on damages as to noneconomic loss and the various claim for future noneconomic loss over the course of the plaintiffs' lives.
The award to each of the plaintiffs was generous but it cannot conclude that it "shocks the conscience." There was credible testimony that their arrest caused these older, long time employees of the defendant considerable emotional distress and humiliation. The jury deliberated several hours over two days. The verdict should not be set aside or reduced based on the foregoing considerations. The court has no talisman to decide that these ladies, if liability was properly found, should not be entitled to damages in the amount they received. CT Page 1069
 (2)
Counsel for the defendant also, however, points to the fact that the jury's verdict was influenced by other factors that occurred at trial. The plaintiffs testimony was emotional, one plaintiff was asked by counsel if she needed a recess. The defendant notes that on more than one occasion the court had to admonish the plaintiffs not to react to the testimony of other witnesses. Also plaintiffs' counsel asked the jury in closing argument to put themselves in the shoes of her clients and gave her personal opinion on the evidence. The defendant argues that all of this created unfair prejudice an bias against the defendant corporation.
But it should be noted that the court cautioned the jury in the introductory section of the charge and the damage section that the defendant corporation was entitled to the same fair treatment as any other litigant and that the jurors would be violating their oath if they did not give that fair treatment to the defendant. The emotional events during the trial were not such as to overwhelm the fact finders and the court has no recollection of the defendant moving for a mistrial or asking for a curative instruction regarding these emotional occurrences.
Concerning the remarks of plaintiffs counsel during closing argument, the defendant properly took an exception after the argument and before the charge to the jury. The court discussed the matter with counsel on the record and proposed a rather detailed instruction admonishing the jury to, in effect, ignore the remarks; counsel for both sides agreed to the instruction which the court did give to the jury. No exception was taken to this aspect of the charge.
The court does not feel a remittitur or new trial would be warranted on the basis of the claims made as to this portion of the defendant's post-trial brief and motion.
 Conclusion
For the foregoing reasons, the defendant's post trial motions are denied.
 ___________________ Corradino, J.